**IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF OHIO
EASTERN DIVISION**

| | | |
|---|---|---|
| MARLEAN A. AMES, | : | |
| Plaintiff, | : | CASE NO. 2:20-CV-05935 |
| v. | : | CHIEF JUDGE ALGENON L. MARBLEY |
| STATE OF OHIO DEPARTMENT OF YOUTH SERVICES, | : | |
| | : | CHIEF MAGISTRATE JUDGE ELIZABETH PRESTON DEAVERS |
| Defendant. | | |

## DEFENDANT OHIO DEPARTMENT OF YOUTH SERVICES' MOTION FOR SUMMARY JUDGMENT

Pursuant to Fed. R. Civ. P. 56, Defendant Ohio Department of Youth Services hereby moves for summary judgment dismissing Plaintiff Marlean Ames's claims of gender and sexual orientation discrimination. As explained in the following memorandum in support, there are no genuine disputes of material fact, and the Ohio Department of Youth Services is entitled to judgment as a matter of law.

Respectfully submitted,

DAVE YOST (0056290)
Ohio Attorney General

*/s/ Cathleen B. Slater*

CATHLEEN B. SLATER (0066088)
*Trial Counsel*
Principal Assistant Attorney General
MEGAN E. JEWETT (0079534)
Senior Assistant Attorney General

Employment Law Section
30 East Broad Street, 16th Floor
Columbus, Ohio 43215
(614) 644-7257 - Telephone
(614) 752-4677 – Facsimile
elsreview@OhioAGO.gov

*Counsel for Defendant*

## <u>TABLE OF CONTENTS</u>

TABLE OF AUTHORITIES ....................................................................... viii

MEMORANDUM IN SUPPORT ................................................................1

I.    Introduction .........................................................................................1

II.   Statement of Facts ..............................................................................2

     A.    The Department ..........................................................................2

     B.    The Department's workforce is comprised of both classified and unclassified civil servants ...............................................................3

     C.    Ames's employment at the Department ......................................4

     D.    The decision to revoke Ames's unclassified status and remove her as PREA Administrator ..................................................................8

     E.    The Bureau Chief Position of Quality Assurance and Improvement Promotion...12

     F.    The objective qualifications of the selected candidate for Bureau Chief of the Office of Quality ...................................................15

III.  Law & Argument ..............................................................................17

     A.    The Department is Entitled to Summary Judgment on Ames's Claims of Discrimination based on Gender or Sexual Orientation Under Title VII .............17

In order for a discrimination case to proceed under Title VII, the plaintiff must adduce either direct or circumstantial evidence of unlawful discrimination. The *McDonnell Douglas* burden-shifting framework applies where a plaintiff offers no direct evidence of discrimination. Under this framework, the plaintiff must first make out her *prima facie* case of discrimination, after which the burden shifts to the employer to proffer a legitimate, nondiscriminatory reason for its decision. If the employer meets its burden, the plaintiff must then prove by a preponderance of the evidence that the employer's proffered reason is pretextual.

*Simpson v. Vanderbilt Univ*., 359 Fed. Appx. 562, 568 (6th Cir. 2009). *McDonnell Douglas Corp. v. Green,* 411 U.S. 792, 802 (1973). *Dews v. A.B. Dick Co*., 231 F.3d 1016, 1020–21 (6th Cir. 2000). *Dews v. A.B. Dick Co*., 231 F.3d 1016, 1020–21 (6th Cir.2000).

B.     Ames does not have Direct Evidence of Discrimination .......................................18

Direct evidence generally requires unmistakable verbal assertions that the plaintiff was treated adversely because of some unlawful factor, such as her sex or sexual orientation in this case. Direct evidence of discrimination, if believed, requires the conclusion that unlawful discrimination was at least a motivating factor in the employer's action. Ames has not identified any statement by the decision makers responsible for the revocation of her unclassified status or her promotion denial as evidence that her sexual orientation or gender played a role in those decisions.

*Carter v. Univ. of Toledo*, 349 F.3d 269, 273 (6th Cir. 2003). *See Gaffney v. Potter*, 2007 U.S. Dist. LEXIS 85259 (N.D. Ohio Nov. 19, 2007). *Wexler v. White's Fine Furniture*, Inc., 317 F.3d 564, 570 (6th Cir. 2003). *Hein v. All American Plywood Co.*, 232 F.3d 482, 488 (6th Cir. 2000).

C.     The Department did not discriminate in selecting a gay employee for the Bureau Chief position ......................................................................................................20

If a claim of discrimination based upon heterosexual status can be made, then Ames's claim must be analyzed under a reverse-discrimination paradigm. When a plaintiff is asserting a claim for reverse-discrimination, there is a higher burden of proof for plaintiffs, who are members of majority classifications.  In order to establish a *prima-facie* claim for reverse discrimination, a plaintiff must present "background circumstances" to support the suspicion that the defendant is an unusual employer who discriminates against the majority.

*Goller v. Ohio Dep't of Rehab. & Correction*, 285 F. App'x 250, 256 (6th Circuit 2008). *Russell v. City of Bellevue*, No. 3:20 CV 2859, 2021 WL 1517921, at *6 (N.D. Ohio Apr. 16, 2021). *Gregory v. Louisville/Jefferson Cty. Metro Govt.*, W.D.Ky. Civil Action No. 3:21-cv-577-CHB, 2021 U.S. Dist. LEXIS 247340, at *11-12 (Dec. 29, 2021). *Zambetti v. Cuyahoga Cmty. Coll.*, 314 F.3d 249, 255 (6th Cir. 2002). *Russell v. City of Bellevue*, No. 3:20 CV 2859, 2021 WL 1517921, at *6 (N.D. Ohio Apr. 16, 2021).

1.     Ames cannot establish her prima facie case of sexual orientation discrimination in selecting a gay employee for the Bureau Chief ............21

     a.     Ames cannot establish the 1st prong of her prima facie case because she has no background circumstances showing that the Department is the unusual employer who discriminates against the majority ......................................................................................21

Ames cannot establish a reasonable causal connection between these complaints and discrimination based upon her sexual orientation. Ames has not indicated any specific examples or events where she or others were singled out for being heterosexual.  None

of Ames's allegations implicate Ames's sexual orientation and are insufficient to demonstrate the requisite statistical evidence or employment policies showing a history of unlawful consideration of sexual orientation by the employer.

*Goller v. Ohio Dep't of Rehab. & Correction*, 285 F. App'x 250, 256 (6th Circuit 2008). *Russell v. City of Bellevue*, No. 3:20 CV 2859, 2021 WL 1517921, at *6 (N.D. Ohio Apr. 16, 2021). *Gregory v. Louisville/Jefferson Cty. Metro Govt*., W.D.Ky. Civil Action No. 3:21-cv-577-CHB, 2021 U.S. Dist. LEXIS 247340, at *11-12 (Dec. 29, 2021). *Zambetti v. Cuyahoga Cmty. Coll*., 314 F.3d 249, 255 (6th Cir. 2002). *Russell v. City of Bellevue*, No. 3:20 CV 2859, 2021 WL 1517921, at *6 (N.D. Ohio Apr. 16, 2021).

b.  Ames cannot establish the fourth prong of her prima facie case of sexual orientation discrimination relative to the Bureau Chief promotion ....................................................................................22

The fourth prong requires that Ames show she was rejected in favor of a similarly-situated applicant outside her protected class. The fact that Ames applied for a position, that was later filled by a gay, female and was evaluated by the same decision-makers does not, in and of itself, make her similarly situated to Frierson. Some comparison between Ames and Frierson is, therefore, necessary in considering the fourth prong of the *prima facie* case.

*Jenkins v. Foot Locker Inc.*, 598 F.App'x 346, 349 (6th Cir. 2015). *See White v. Columbus Metro. Housing Auth*., 429 F.3d 232, 241-42 (6th Cir. 2005).

2.  The Department's decision to promote Frierson was based on legitimate, nondiscriminatory business reasons ..........................................................24

The Department had legitimate, nondiscriminatory business reasons for its decisions, which not only rebuts any presumption raised by plaintiff's asserted *prima facie* case, but also invites summary judgment review of plaintiff's burden to show pretext

*White v. Ohio*, 2 F.App'x 453, 458 (6th Cir. 2001).

a.  Ames cannot establish that the Department's legitimate, nondiscriminatory business reasons for its decision to promote Frierson are pretext for discrimination ..........................................25

To show pretext, Ames must show: "(1) that the proffered reasons had no basis in fact; (2) that the proffered reasons did not actually

motivate the decision; or (3) that they were insufficient to motivate the employment decision." (emphasis omitted). When an employer offers more than one independent, legitimate, nondiscriminatory reason for an adverse employment action, even if one is found to be pretextual but at least one other is not, the employer is entitled to summary judgment.

*Tingle v. Arbors at Hilliard*, 692 F.3d 523, 530 (6th Cir. 2012). *Jones v. St. Jude Medical S.C., Inc.*, 504 Fed. Appx. 473, 477 (6th Cir. 2012). *Burks v. Yellow Transp., Inc*., 258 Fed. Appx. 867, 876 (6th Cir. 2008).

i.      No basis in fact...................................................................25

To show a triable question of fact, based on the relative qualifications of the candidates, Ames cannot show that she was (1) the plainly superior candidate, such that no reasonable employer would have chosen the latter applicant over the former, or (2) that she was qualified…if not better qualified than the successful applicant, *and the record contains 'other probative evidence of discrimination*.'"

*Harris v. City of Akron,* 6th Cir. No. 19-4101, 2020 U.S. App. LEXIS 39222, at *9 (Dec. 15, 2020). *Provenzano v. LCI Holdings, Inc*., 663 F.3d 806, 815 (6th Cir. 2011). *Leisring v. Clerk of Hamilton Cnty. Mun. Court*, 6th Cir. No. 20-3395, 2020 U.S. App. LEXIS 40728, at *4-5 (Dec. 30, 2020). *Hedrick v. W. Reserve Care Sys.,* 355 F.3d 444, 462 (6th Cir. 2004); *see also Perryman v. Postmaster Gen.*, 475 Fed.Appx. 585, 590 (6th Cir. 2012) *Bender v. Hecht's Dep't Stores,* 455 F.3d 612, 627 (6th Cir. 2006). *Harris v. City of Akron,* 6th Cir. No. 19-4101, 2020 U.S. App. LEXIS 39222, at *9 (Dec. 15, 2020). *Provenzano v. LCI Holdings, Inc*., 663 F.3d 806, 815 (6th Cir. 2011). *Wexler v. White's Fine Furniture,* 317 F.3d 564, 576 (6th Cir. 2003).

ii.      Did not actually motivate ................................................. 27

Ames cannot show that the sheer weight of circumstantial evidence of discrimination makes it more likely than not that the Department's explanation is a pretext, or cover-up.

*Manzer v. Diamond Shamrock Chems. Co.*, 29 F.3d 1078, 1084 (6th Cir. 1994). *White v. Columbus Metro. Housing Auth*., 429 F.3d 232, 241-42 (6th Cir. 2005).

iii.     Insufficient to motivate .....................................................28

The Department is entitled to some deference in business-making decisions. An employer has even greater flexibility, and is entitled to additional deference, where, as here, a management-level Bureau Chief position is at issue.

*Smith v. Legget Wire Co.,* 220 F.3d 752, 763 (6th Cir. 2000). *Johnson v. Metro. Gov. of Nashville and Davidson Cnty.*, 502 F.App'x 523, 539 (6th Cir. 2012). *Bender v. Hecht's Dep't Stores,* 455 F.3d 612, 627 (6th Cir. 2006). *See Wrenn v. Gould,* 808 F.2d 493, 502 (6th Cir. 1987). *Mitchell v. Toledo Hosp.*, 964 F.2d 577, 584-585 (6th Cir. 1992).

D.     The Department did not discriminate against Ames in revoking her unclassified position and replacing her with a gay, male employee.........................................29

1.     Ames cannot establish the first prong of her prima facie sexual orientation case because she has no background circumstances showing DYS is the unique employer that discriminates against the majority .........................29

The revocation decision was made by two (2) heterosexual employees. Ames has not and cannot produce statistical evidence or employment policies showing a history of unlawful consideration of sexual orientation by the employer in relation to the revocation of unclassified positions.

*Goller*, 285 F. App'x 250, 256 (6th Circuit 2008). *Russell,* No. 3:20 CV 2859, 2021 WL 1517921, *Gregory,* Civil Action No. 3:21-cv-577-CHB, 2021 U.S. Dist. LEXIS 247340, at *11-12. *Zambetti v. Cuyahoga Cmty. Coll.*, 314 F.3d 249, 255.

2.     The Department does not dispute Ames can establish the prima facie case of her gender discrimination claim for revocation of her unclassified position.......................................................................................................29

The Department does not dispute that Ames is a member of a protected class (female), was qualified for her job, suffered an adverse employment action, and was replaced by a person outside the protected class (male), and therefore, meets her prima-facie case of gender discrimination.

*White v. Baxter Healthcare Corp*., 533 F.3d 381, 391 (6th Cir. 2008). *McDonnell Douglas Corp. v. Green*, 411 U.S. 792, 802, 93 S. Ct. 1817, 36 L. Ed. 2d 668 (1973).

3.     The Department's decision to revoke Ames's unclassified status was based on legitimate, nondiscriminatory business reasons....................................29

a.     Ames cannot establish that the Department's legitimate, nondiscriminatory business reasons for its decision to revoke Ames's unclassified status are pretext for discrimination ............. 30

i.     No basis in fact ................................................................ 31

Ames's denial of the Department's articulated reasons for her revocation of unclassified status, without further substantiation, is insufficient. Because the Department held an honest belief in its proffered reason, Ames cannot establish pretext even if the Department's reason is ultimately found to be mistaken, foolish, trivial, or baseless.

*Mitchell v. Toledo Hosp.*, 964 F.2d at 577. *Seeger v. Cincinnati Bell Tel. Co.*, LLC, 681 F.3d 274, 285-86 (6th Cir. 2012). *Sims-Madison v. Dana Commer Vehicle Mfg.*, LLC, 6th Cir. No. 21-5706, 2022 U.S. App. LEXIS 8389, at *6-7 (Mar. 28, 2022). Smith v. Chrysler Corp., 155 F.3d 799, 807 (6th Cir.1998). Braithwaite v. Timken Co., 258 F.3d 488, 494 (6th Cir. 2001).

ii.     Did not actually motivate .................................................... 32

Ames cannot show that the sheer weight of circumstantial evidence of discrimination makes it more likely than not that the Department's explanation is a pretext, or cover-up.

*Manzer v. Diamond Shamrock Chems. Co.*, 29 F.3d 1078, 1084 (6th Cir. 1994). *McDonald v. Union Corp.*, 898 F.2d at 1160, 1162 *Palucki v. Sears, Roebuck & Co.*, 879 F.2d 1568, 1571 (7th Cir. 1989).

iii.     Insufficient to motivate ..................................................... 33

Ames has failed to allege any circumstances tending to prove that intentional discrimination was a deciding factor in the employment decision. The fact that Ames was replaced by a gay, male, alone, however, is insufficient to prove discriminatory animus.

*St. Mary's Honor Ctr. v. Hicks*, 113 S. Ct. 2742 (1993). *Manzer*, 29 F.3d at 1084. McDonald, 898 F.2d at 1162; Young v. State Farm Mut. Auto. Ins. Co., 868 F. Supp. 937, 945 (W.D. Tenn. 1994). See also Moody v. Jefferson Parish Sch. Bd., 803 F. Supp. 1158.

*Noble v. Brinker Int'l, Inc.*, 391 F.3d 715, 728-29 (6th Cir. 2004). *Mitchell v. Toledo Hosp.*, 964 F.2d 577, 583 (6th Cir. 1992)). *Ercegovich v. Goodyear*, 154 F.3d 344, 352 (6th Cir. 1998). *McClain*, 440 F.3d 320, 330.

IV.    Conclusion ........................................................................................................36

  CERTIFICATE OF SERVICE ....................................................................................38

## <u>TABLE OF AUTHORITIES</u>

**Page(s)**

**Cases**

*Ames v. State Dept. of Youth Servs.*,
    S.D.Ohio No. 2:20-cv-05935, 2022 U.S. Dist. LEXIS 56463 (Mar. 29, 2022).........................1

*Bender v. Hecht's Dept's Stores*,
    455 F.3d 612 (6th Circuit 2004) ....................................................................................27, 28

*Braithwaite v. Timken Co*.,
    258 F.3d 488 (6th Cir. 2001) ...............................................................................................32

*Burks v. Yellow Transp., Inc*.,
    258 Fed. Appx. 867 (6th Cir. 2008).....................................................................................26

*Carter v. Univ. of Toledo*,
    349 F.3d 269 (6th Cir. 2003) ...............................................................................................18

*Dews v. A.B. Dick Co*.,
    231 F.3d 1016 (6th Cir.2000) ..............................................................................................18

*Gaffney v. Potter*,
    2007 U.S. Dist. LEXIS 85259 (N.D. Ohio Nov. 19, 2007) ..................................................18

*Goller v. Ohio Dep't of Rehab. & Correction*,
    285 F. App'x 250 (6th Cir.2008) .........................................................................................20

*Gregory v. Louisville/Jefferson Cty. Metro Govt.*,
    W.D.Ky. Civil Action No. 3:21-cv-577-CHB, 2021 U.S. Dist. LEXIS 247340
    (Dec. 29, 2021) ...........................................................................................................20, 21

*Harris v. City of Akron*,
    6th Cir. No. 19-4101, 2020 U.S. App. LEXIS 39222 (Dec. 15, 2020)...................................26

*Hedrick v. W. Reserve Care Sys.*,
    355 F.3d 444 (6th Cir. 2004) ...............................................................................................27

*Hein v. All American Plywood Co*.,
    232 F.3d 482 (6th Cir. 2000) ...............................................................................................19

*Jenkins v. Foot Locker Inc.*,
    598 F.App'x 346 (6th Cir. 2015) .........................................................................................22

*Johnson v. Metro. Gov. of Nashville and Davidson Cnty.*,
   502 F.App'x 523 (6th Cir. 2012) ............................................................28

*Jones v. St. Jude Medical S.C., Inc.*,
   504 Fed. Appx. 473 (6th Cir. 2012) ................................................25, 26

*Leisring v. Clerk of Hamilton Cnty. Mun. Court*,
   6th Cir. No. 20-3395, 2020 U.S. App. LEXIS 40728 (Dec. 30, 2020) ..................................26

*Manzer v. Diamond Shamrock Chems. Co.*,
   29 F.3d 1078 (6th Cir. 1994) ...............................................27, 31, 32, 34

*McClain v. Northwest Community Corr. Ctr. Judicial Corr. Bd.*,
   440 F.3d 320 (6th Cir. 2006) ............................................................3, 35

*McDonald v. Union Corp.*,
   898 F.2d at 1160, 1162 ...................................................................33, 34

*McDonnell Douglas Corp. v. Green*,
   411 U.S. 792 (1973).........................................................................18

*Mesnick v. Gen. Elec. Co.*,
   950 F.2d 816 (1st Cir. 1991).............................................................33

*Mitchell v. Toledo Hosp.*,
   964 F.2d 577 (6th Cir. 1992) .....................................................29, 31, 36

*Moody v. Jefferson Parish Sch. Bd.*,
   803 F. Supp. 1158 ..........................................................................34

*Noble v. Brinker Int'l, Inc.*,
   391 F.3d 715 (6th Cir. 2004) ...........................................................34

*Palucki v. Sears, Roebuck & Co.*,
   879 F.2d 1568 (7th Cir. 1989) .........................................................33

*Perryman v. Postmaster Gen.*,
   475 Fed.App'x. 585 (6th Cir. 2012) ..................................................27

*Provenzano v. LCI Holdings, Inc.*,
   663 F.3d 806 (6th Cir. 2011) ...........................................................26

*Russell v. City of Bellevue*,
   No. 3:20 CV 2859, 2021 WL 1517921 (N.D. Ohio Apr. 16, 2021) ........................21

*Russell v. Univ. of Toledo*,
   537 F.3d 596 (6th Cir. 2008) ...........................................................31

*Seeger v. Cincinnati Bell Tel. Co., LLC*,
    681 F.3d 274 (6th Cir. 2012) ................................................................32

*Simpson v. Vanderbilt Univ.*,
    359 Fed. Appx. 562 (6th Cir. 2009) ......................................................18

*Sims-Madison v. Dana Commer Vehicle Mfg., LLC*,
    6th Cir. No. 21-5706, 2022 U.S. App. LEXIS 8389 (Mar. 28, 2022) ....................32

*Smith v. Chrysler Corp.*,
    155 F.3d 799 (6th Cir.1998) ................................................................32

*Smith v. Legget Wire Co.*,
    220 F.3d 752 (6th Cir. 2000) ................................................................28

*St. Mary's Honor Ctr v. Hicks*,
    113 S. Ct. 2742 ................................................................33, 34

*Tingle v. Arbors at Hilliard*,
    692 F.3d 523 (6th Cir. 2012) ................................................................25

*Wexler, Wexler v. White's Fine Furniture*,
    317 F.3d 564 (6th Cir. 2003) ................................................................18, 27

*White v. Baxter Healthcare Corp.*,
    533 F.3d 381 (6th Cir. 2008) ................................................................29

*White v. Columbus Metro. Housing Auth.*,
    429 F.3d 232 (6th Cir. 2005) ................................................................23, 28

*White v. Ohio*,
    2 F.App'x 453 (6th Cir. 2001) ................................................................24

*Wrenn v. Gould*,
    808 F.2d 493 (6th Cir. 1987) ................................................................28

*Young v. State Farm Mut. Auto. Ins. Co.*,
    868 F. Supp. 937 (W.D. Tenn. 1994) ................................................................34

**Statutes**

29 U.S.C. § 623, et seq. ................................................................1

42 U.S.C. § 1983 ................................................................1

Ohio Adm. Code 123:1 (A)(68) ................................................................8

Ohio Rev. Code Chapter 4112 ................................................................1

Ohio Rev. Code § 124.11 ................................................................................................................3

Ohio Rev. Code § 124.11(D) .........................................................................................................4

Ohio Rev. Code § 5139.01(B) .......................................................................................................4

ORC 124.11 .................................................................................................................................36

<u>**MEMORANDUM IN SUPPORT**</u>

## I.    Introduction

The Ohio Department of Youth Services ("the Department") has a paramount duty to improve Ohio's future through habilitating youth. To that end, the Department is called upon to cultivate a trauma-responsive environment for youth and staff to thrive. The Department employs staff in a variety of roles to carry out its critical mission of providing youth with education, behavioral health care, and other necessary services as they transform their lives. It is this mission that drives employment decisions within the Department—not the gender or sexual orientation of the employees.

Plaintiff Marlean Ames ("Ames") brings two claims against the Department. She alleges the Department discriminated against her on the basis of her gender (female) and her sexual orientation (heterosexual).[1] (Doc. 28; PageID 202)[2]. The crux of Ames's claims arise from two events: (1) the Department revoked her unclassified status, which removed her as the Department's Prison Rape Elimination Act ("PREA") Administrator, and appointed a gay, male to the position;

---

[1] In the Amended Complaint, Ames also asserted hostile work environment based on sexual orientation and age under Title VII (Count 2); Retaliation under Title VII (Count 3); Age discrimination under 29 U.S.C. § 623, et seq. (ADEA) (Count 4); Fourteenth Amendment due process rights under 42 U.S.C. § 1983 (Count 5); Age discrimination under Ohio Rev. Code Chapter 4112 (Count 6); Gender discrimination under Ohio Rev. Code Chapter 4112 (Count 7); and Hostile work environment under Ohio Rev. Code Chapter 4112 (Count 8). These claims were dismissed pursuant to this Court's Opinion and Order dated March 29, 2022. *Ames v. State Dept. of Youth Servs.*, S.D.Ohio No. 2:20-cv-05935, 2022 U.S. Dist. LEXIS 56463 (Mar. 29, 2022).

[2] All referenced depositions and exhibits have been filed with the Court.  Citations to the transcripts will be noted as (Witness name Dep., Doc. *no*., PageID *no(s).*)  Exhibits will be referred to as "Ex. *no.*" following a citation to the deposition or declaration in which they have been identified and authenticated and "Doc. *no*., PageID *no(s)*" for the filed exhibit.  Declarations are being filed concurrently with this Motion, and references to those will be noted as (*Declarant name* Dec. ¶ *paragraph no.* Ex. *Letter (if applicable).*)

(*Id*. at 200), and (2) Ames was denied a promotion to Bureau Chief, and the Department appointed a gay, female. (*Id*. at 202).

Ames has no direct evidence of discrimination to support any discrimination claims, i.e. statements tying a prohibited motive to a decision-maker and an adverse action, and she cannot prove a circumstantial case of differential treatment. The Department made legitimate business decisions to further the goals of the Department's mission.

Moreover, Ames is unable to show that the Department's legitimate, nondiscriminatory reasons for its actions are pretextual. Thus, Ames's claims are without merit. For the reasons that follow, the Department is entitled to summary judgment.

## II.      Statement of Facts

### A.      The Department

The Department is the juvenile corrections system for the State of Ohio. *See generally* Ohio Rev. Code Chp. 5139. The Department houses and educates felony juvenile offenders, ages ten to twenty-one, who have been adjudicated and committed by a juvenile court. *See generally id.* Beyond youth in facilities and those on parole, the Department funds and supports approximately 600 community programs throughout the state, offering about 88,000 youth and families (based on annual program admissions) opportunities and services to affect positive change.[3]

The Department operates a Central Office located in Columbus, Ohio and three (3) state-wide juvenile correctional facilities, and provides parole services from five (5) district sites. There are nine (9) divisions within the Department, employing approximately 961 individuals. (East Dec. ¶ 4). The Department has Bureau Chiefs which are management positions and supervise offices or units within the different divisions of the Department. (Trim Dec. ¶11).

---

[3] https://ohio.gov/government/state-agencies/department-of-youth-services.

2

The Department further maintains both agency-wide and facility-specific positions that focus on allowing the Department to comply with federal mandates and grant funding. (East Dec. ¶ 5). One such position is the Prison Rape Elimination Act Administrator (also known as the PREA Administrator). (Walburn Dec. ¶ 4). The Prison Rape Elimination Act (PREA) is a federal law that was enacted by Congress in 2003 to support the detection, prevention, and elimination of sexual abuse and sexual harassment in prisons, jails, juvenile facilities, community facilities, and lock up facilities. [4] (Walburm Dec. ¶5-6). The PREA Administrator plans and administrates the Prison Rape Elimination Act compliance for the Department, develops policy, and monitors existing polices to ensure compliance with PREA standards. (Walburn Dec. ¶ 5,East Dec. ¶ 11, Exhibit D. The PREA Administrator is also responsible for quality assurance, site visits, audit reports, and trainings in the areas of sexual assault, abuse, and harassment to ensure the Department's compliance with federal mandates. (East Dec. ¶ 11, Exhibit D.). ).

## B. The Department's workforce is comprised of both classified and unclassified civil servants

As part of the civil service of the State of Ohio, the Department's workforce is comprised of both classified and unclassified civil servants. Ohio Rev. Code § 124.11. Unclassified employees are appointed and serve at the discretion of the appointing authority. *See, e.g.*, *McClain v. Northwest Community Corr. Ctr. Judicial Corr. Bd.*, 440 F.3d 320, 330 (6th Cir. 2006). The appointing authority has the right to revoke an unclassified appointment with or without cause. *Id.* If an unclassified appointment is revoked, the employee has the right to exercise fallback rights, returning to their most recently held classified position prior to the employee's appointment to the

---

[4] Prison Rape Elimination Act | Department of Youth Services (ohio.gov)

position in the unclassified service or to a position certified by the Director of Administrative Services as being substantially equal to the that position. Ohio Rev. Code § 124.11(D).

The Department's Director is the appointing authority for the Department. (Gies Dep., Doc. 69; PageID 2080; Ohio Rev. Code § 5139.01(B)). Because unclassified employees are appointed and serve at the pleasure of the appointing authority, the Department's process for filling unclassified positions differs from its process for filling classified positions. (Gee Dec. ¶ 7). Openings for unclassified positions are not required to be posted and, in fact, generally, are not posted. (Gee Dec. ¶ 10; Ames Dep., Doc. 62; PageID 1177). Additionally, the Department is not required to conduct interviews to fill unclassified positions. (Gee Dec. ¶¶ 8, 9). Section VI(F) of the Application Selection Procedure states, "Applicants for Unclassified Service *may* be interviewed." (emphasis added). (Walburn Dep., Doc. 60, PageID 630-631; Ex. 29, Doc. 60-1, PageID 696.) Applicants can be appointed to unclassified positions without an interview. (Gee Dec. ¶ 8, 9).

Applicants for positions in the Department's unclassified service must complete an Ohio Civil Service Application, but it is not required prior to an interview or the appointment. (*Id.* at ¶ 11) Minimum qualifications for the position are determined by the Human Resources department upon review of the applicant's information. (Gee Dec. ¶ 12). These aforementioned steps pertaining to an unclassified appointment may be done prior to or after an employment offer is made. (Gee Dec. ¶ 11, 13). After qualifications are verified, the appointing authority, and Governor's office, sign off on the appointment to the position.

C.    **Ames's employment at the Department**

Ames began her employment with the Department in 2004 as an Executive Secretary in the Akron Parole Region. (East Dec. ¶ 15, Ex. G; Ames Dep., Doc. 62; PageID 1014;. In 2005,

Ames transferred to the Indian River facility working in the same capacity as an Executive Secretary. (Ames Dep., Doc. 62; PageID 1029). Ames describes her duties at both locations as performing secretarial duties. (Ames Dep., Doc. 62; PageID 1030). The Executive Secretary position is in the classified civil service. (*Id*.). She continued as an Executive Secretary until January 2009. (East Dec. ¶ 15, Ex. G; Ames Dep., Doc. 62; PageID 1050).

On January 4, 2009, Ames was appointed to the position of Administrative Assistant 3. (Ames Dep., Doc. 62; PageID 1031; Ex. 4, Doc. 62-1; PageID 1257; Ames Dep., Doc. 62; PageID 1042). This position had a working title of "Community Facility Liaison" and was in the unclassified civil service. (Ames Dep., Doc. 62; PageID 1031; Ex. 4, Doc., 62-1; PageID 1257). While Ms. Ames was working in this position, the name changed from Administrative Assistant 3 to Program Administrator 2, but, functionally, it was the same position. (Ames Dep., Doc. 62; PageID 1049; East Dec. ¶ 15 Ex. G). As a Community Facility Liaison, Ms. Ames did not supervise or direct other employees. (Ames Dep. Doc. 62; PageID 1047-1048; Ex. 6, Doc. 62-1; PageID 1259). In this role, Ames assisted her supervisor to evaluate and monitor community facility programs, made on-site visits for code compliance, assisted community facilities in developing program direction, trainings and assistance with PREA standards compliance; and completed annual reports for community facilities. (*Id*.).

In April, 2014, Ames was appointed to the unclassified position of Program Administrator 3 with a working title of PREA Administrator, in the Department's Office of Quality and Improvement ("Office of Quality"). (Ames Dep. Doc. 62; PageID 1053- 1054; East Dec. ¶ 15, Ex. G). Ames acknowledged that this position was unclassified. (Ames Dep., Doc. 62; PageID 1055; Ex. 7, Doc. 62-1; PageID 1260). Ames did not supervise any employees in this role. (East Dec. ¶11, Ex. D). Ames stated that in this role she conducted inspections at the detention centers for

compliance, taught Prison Rape Elimination Act ("PREA"), conducted trainings for detention facility staff, and oversaw compliance of the community corrections facilities. (Ames Dep., Doc. 62; PageID 1051).

While working as the PREA Administrator in the Office of Quality, for a time, Ames was supervised by Wendy Faulker. (Ames Dep., Doc. 62; PageID 1071). Ames, without personal knowledge, identified Faulkner as a "straight" female. (Ames Dep., Doc. 62; PageID 1072). Beginning in 2017, Ames was also supervised by Ginine Trim, identified by Ames as a member of the "LGBTI community." (Ames Dep., Doc. 62; PageID 1073). Trim confirmed that she is gay. (Trim Dep., Doc. 64; PageID 1507).

As noted above, Ames was supervised by Ginnie Trim, the Deputy Director of the Division of Professional Standards and Chief Inspector, Office of Quality. (Trim Dep., Doc. 64; PageID 1514, 1515; Ames Dep., Doc. 62; PageID 1072). Ames and Trim had a good working relationship. (Ames Dep., Doc. 62; PageID 1073). Trim was not aware of Ames's sexual orientation, stating that she "didn't have any reason to believe she was or she wasn't. It [sexual orientation] just never came up." (Trim Dep., Doc. 64; PageID 1511). Trim, in turn, reported to Assistant Director Julie Walburn. (Ames Dep., Doc. 62; PageID 1072; Trim Dep., Doc. 64; PageID 1516). Walburn characterized her relationship with Ames as "professional." (Walburn Dep., Doc. 60; PageID 617). Ames claims to have no personal knowledge of Walburn's sexual orientation other than Walburn's testimony [at her deposition] that she is straight. (Ames Dep., Doc. 62; PageID 1087). Walburn reported to Gies who was appointed by Governor DeWine as Director of the Department in 2019. ( Gies Dep., Doc. 69; PageID 2080). Ames stated that she had no personal knowledge of Gies's sexual orientation, but assumed he was "straight, cisgender." (Ames Dep., Doc. 62; PageID 1086).

Ames remained in the PREA Administrator position until she was given notice that her unclassified appointment was revoked. On May 10, 2019, Ames was informed in a meeting attended by Walburn and Robin Gee, Human Resources Administrator, that her unclassified status was revoked, and she was provided notice of her statutory right to fallback to her last classified position or an equivalent position. (Ames Dep., Doc. 62; PageID 1074, Gee Dec, ¶ 26;). According to Ames, Walburn explained that the Department was moving PREA "in a new direction." (Ames Dep., Doc. 62; PageID 1075). At the meeting, Ames was presented a document which gave her the right to accept or decline her fallback rights. ( Gee Dec. ¶ 22, Ex. A). Ames was upset at the meeting and left abruptly, without electing her fallback rights. (Gee Dec. ¶ 31). Because Ames was upset, Gee wanted to ensure that Ames understood the consequence of her choice not to accept her fallback rights. After the meeting, Gee immediately sought out Ames who was in Ginine Trim's office.  Gee explained to Ames that it was her choice to sign the document, but, if she did not sign, then she would be waiving the right to exercise her fallback rights, which meant she would have no job with the state of Ohio. (Ames Dep., Doc. 62; PageID 1175; Gee Dec.¶ 33). On May 10, 2019, Ames exercised her statutory fallback rights to her most recently classified position as Executive Secretary I, which position had been previously reclassified by the Ohio Department of Administrative Services to Administrative Professional 4.[5] (East Dec. ¶ 15, Ex. G; Ames Dep., Doc. 62; PageID 1077). (Ex. 9, Ames Dep., Doc. 62; PageID 1076, 1077; Doc.1-2, PageID 15).

Currently, Ames is employed by the Department. She was recently promoted from her position as Administrative Professional 4 and appointed to the position of Human Services Program Administrator 2 ("HSPA2") with a working title of Facility Investigator, an unclassified position. She works out of Indian River Juvenile Correctional Facility. (Gee Dec. ¶ 14).

---

[5] See, Ohio Adm. Code  123:1 (A)(68)

7

**D.** **The decision to revoke Ames's unclassified status and remove her as PREA Administrator**

Ryan Gies was appointed by Governor DeWine to serve on the Governor's cabinet and lead the Department as Director in January 2019. (Gies Dep., Doc. 69; PageID 2129). As Director, Gies's role was to work on policy with other cabinet agencies and the Governor's Office. (Gies Depo. Doc. 69; PageID 2080). Gies was responsible for everything that happened in the Department. (Gies Dep., Doc. 69; PageID 2129-2130, 2080). At the time of his appointment, sexual victimization was a significant concern for the Department and the Governor's office. (*Id.*). As the newly appointed Director, Gies had discussions with the Assistant Director, Julie Walburn, about policy initiatives and personnel. (Walburn Dec. ¶ 8). Gies wanted to have people in place that could fulfill his vision for the Department. (Gies Dep., Doc. 69; PageID 2130). Gies expressed that he desired personnel that went beyond just meeting expectations. (Walburn Dec. ¶ 9). The Department had a challenging culture within its facilities that needed to be addressed with strong leadership, specifically in relation to PREA policy. (Gies Dep., Doc. 69; PageID 2127).

Additionally, after Geis was appointed, the Department's Central Office positions were reorganized. (Trim Dec. ¶ 7). One change was that the Chief Inspector's Office, and the Office of Quality were combined into one Division. (*Id.* ¶ 8). The combined Division was called the Division of Professional Standards and the Office of the Chief Inspector. Trim, who had served as a Deputy Director over the Department's Office of Technology and the Office of Quality moved into a new role as Deputy Director over the combined Division. (*Id.* ¶ 9). As a result of her new role, Trim was no longer responsible for the Office of Technology. (*Id.* ¶ 9).

In relation to the PREA Administrator position, when Gies became Director of the Department, he stated that "[he] need[ed] to have people in places that [could] fulfill the vision of moving us forward, not just meeting minimum [PREA] standards." (Gies Dep., Doc. 69;

PageID 2130). Geis and Walburn discussed their concerns with the Department's PREA policy and, specifically, with Ames's approach to PREA policy. (Walburn Dec. ¶ 9, 10).

Gies relayed that his Assistant Director shared with him that Ames, in the position of PREA Administrator, did not have vision, could not carry the culture of preventing victimization, and could not work collaboratively. (*Id.*). Gies agreed with Walburn's assessment of Ames, based upon his previous experience and feedback from community partners that "Ames was hard to work with, hard to communicate with, and dictated rather than help[ed] our partners in the community. (Gies Dep., Doc. 69; PageID 2099-2101). Gies described Ames's workplace demeanor as "abrasive." (Gies Dep., Doc. 69; PageID 2108). Gies and Walburn desired a person in the PREA Administrator role that could support all facilities "in a vision of changing the culture around preventing sexual victimization of any kind." (Gies Dep., Doc. 69; PageID 2126). Both Gies and Walburn agreed that Ames was not the person to accomplish their goals for the program. (Gies Dep., Doc. 69; PageID 2126, Walburn Dep., Doc. 60; PageID 649). Walburn had concerns with Ames's work product. (Walburn Dep.Doc. 60; PageID 618-621). Walburn previously shared with Ames that, with regard to PREA, the Department was concerned that it was not being proactive in their policy framework. (Walburn Dep. Doc. 60; PageID 620-621,). Walburn stated that the Department's goal was to live by the PREA standards on a daily basis, as opposed to just having paperwork that showed compliance when audited. (*Id.*). Walburn's assessment was that Ames did not have a vision for use of the PREA grant funds or the PREA program to use data, incident review, and collaborative relationships throughout facilities to be responsive to PREA incidents. (Walburn Dec. ¶ 11). Walburn met with Ames a number of times between 2017 and 2019 to discuss issues that Walburn had with Ames's work product. (Walburn Dep. Doc. 60; PageID 620). Trim was also present for these meetings. (Trim Dec. ¶15; Walburn Dep. Doc. 60PageID 624). Walburn

stated that in these meetings she told Ames that she was concerned about the performance of the PREA program, the certification process, the timeliness of investigations of PREA allegations from youth in the Department's care, and the process of youth coming into the Department's system and then the reassessment of them on a periodic basis. (*Id*). Walburn felt that Ames, in her leadership of the PREA program, was not proactive enough. (Walburn Dep., Doc. 60; PageID 620-621). Additionally, Ames performed poorly in an interview that Walburn had conducted for a Bureau Chief position in April 2019, which confirmed Walburn's lack of confidence in Ames's ability to lead the PREA program. (Walburn Dep., Doc. 60; PageID 649, 658).

Walburn and Gies were the decision-makers and decided to revoke Ames's unclassified status. (Walburn Dep.,Doc. 60; PageId 656, 659). Ames's supervisor, Trim, was informed, but was not a decision-maker in the decision to revoke Ames's unclassified status. (Trim Dep., Doc. 64; PageID 1522; Walburn Dep., Doc. 60; PageID 656). However, Trim was not surprised by the Director and Assistant Director's decision to make a change and remove Ames. (Trim Dep., Doc. 64; PageID 1525-1526). Trim stated, " [w]e're all unclassified and work at the pleasure of [the appointing authority] So, you know, in my career I've seen and heard of a lot of people being replaced and moved, so I -- I can't say that I was necessarily surprised." (Trim Dep., Doc. 64; PageID 1515). Trim elaborated and indicated that the overall vision of the role was not being fulfilled by Ames. (Trim Dep., Doc. 64; PageID 1526). A large portion of Ames's job was to administer PREA grant funds. (Trim Dep., Doc. 64; PageID 1520). Trim was aware that the Director and Assistant Director were not happy with the planning of how the grant dollars were being effectuated in facilities across the agency and with some slow responses to have a plan in place to administer the grants. (Trim Dep., Doc. 64; PageID 1525-1526). Trim had several conversations with Ames about the need to plan, and, thoughtfully, spend PREA grant money to

enhance sexual safety efforts in the facility. (Trim Dep., Doc. 64; PageID 1527; P's Ex 53 p. 277-278). Trim had also noted in Ames's performance evaluations that Ames had room to improve, to take a more active role in the area of managing PREA grant funds in the next rating period (Trim Dep., Doc. 64; PageID 1529;Doc. 64-1, PageID 1650.), and to improve to ensure she was providing accurate advice and guidance to senior leadership (Trim Dep., Doc. 64; PageID 1529-1530, Doc. 64-1, PageID 1649).

At the time Gies and Walburn made the decision to revoke Ames's unclassified status, they had not identified anyone to fill the PREA Administrator position. After the decision was made to remove Ames, Gies and Walburn "talked about if [they] knew of people who could possibly do it." (Gies Dep.,Doc. 69; PageID 2140). Thereafter, Gies initially thought of Alex Stojsavljevic as a potential replacement. (Gies Dep., Doc. 60; PageID 2143, 2146). He consulted with Walburn, and they both agreed on Stojsavljevic as a potential replacement. (*Id*.) When asked what made him think of Stojsavljevic to fill the PREA Administrator position, Gies cited Stojsavljevic's history of working with PREA at Indian River Juvenile Correctional Facility, that he was professional, communicated extremely well, presented very well, was thorough with documentation, and that he planned very well as the Criminal Justice Planning Supervisor. (Gies Dep., Doc. 69; PageID 2146-2147, 2157). Stojsavljevic was appointed to the position on May 26, 2019. (Gies Dep., Doc. 69; PageID 2158-2159; Stojsavljevic Dep. Doc. 68; PageID 1827; Doc. 68-1; PageID 1946-1947). After the decision had been made, Walburn told Trim that Stojsavljevic would be placed in the position. (Trim Dep., Doc. 64; PageID 1559-1560). Trim had no input into the decision. (*Id*.). In Gies's deposition, when asked whether Stojsavljevic is gay, Gies says he does not know but has been told by another employee that Stojsavljevic is gay. (Gies Dep., Doc. 69; PageID 2157-2158).

Both Gies and Walburn answer, "no" when they are asked if they are or have ever been gay. (Gies Dep., Doc. 69; PageID 2091; Walburn Dep., Doc. 60; PageID 624).

E.     **The Bureau Chief Position of Quality Assurance and Improvement Promotion**

In 2019, a position of Bureau Chief of Quality was announced. (Ames Dep., Doc. 62: PageID 1093). This was considered a new position for the Department because, at that time, the Office of Quality did not have anyone directly overseeing the employees. (Walburn Dep., Doc. 60; PageID 636-637; Trim Dep., Doc. 64; PageID 1568).

Walburn was in charge of framing the Bureau Chief position to meet the needs of the Department. (Walburn Dep., Doc. 60; PageID 639). As described in the position description, the Bureau Chief is a management role and serves as the leader of the Office of Quality, responsible for supervising the workforce and ensuring collaboration with other areas to ensure a multidisciplinary approach to the work of the Office of Quality.[6] (East Dec. ¶ 9, Ex. B; Trim Dec. ¶13, Ex. A). The position requires knowledge of management, workforce planning, supervision, interviewing, and Department policies. (*Id.*). Other key skills include the ability to implement specific action, use statistical analysis, prepare reports, gather and classify information and establish a friendly workplace atmosphere (*Id.*). The classification specification that was assigned to the Bureau Chief position was Administrative Officer 3.[7] (Frierson Dec. ¶ 3).

---

[6] The Department maintains position descriptions for its various positions. The position description is specific to the actual position, explains what is required or expected from the job, and further refines the position. For example, multiple employees may have the class specification "Program Administrator 3," but may hold different positions or working titles within the Department and in different divisions. (*Id.*).

[7] The Ohio Department of Administrative Services maintains class specifications that apply to positions at all state agencies, including the Department. (East Dec. ¶ 6). The class specifications generally describe the kind of work performed by employees within the class. (*Id.*). The specifications are minimum attributes and/or skills that the employee must possess to hold a

Walburn authorized Trim to make a Bureau Chief position available to the employees in the Office of Quality. (*Id.*) Because the position was unclassified, the Department was not required to post the position. (Gee Dec. ¶ 10); Trim Dep., Doc. 64; PageID 1576: Ames Depo. Doc. 62, - PageID 1177). The Department did, however, announce the Bureau Chief position to the Office of Quality, and all the team members, including Ames, were invited to apply for the position. (Trim Dep., Doc. 64; PageID 1568, 1577; Frierson Dep., Doc. 63; PageID 1352). Trim sent out an email, and also called an informal meeting to announce the position. (Trim Dep., Doc. 64; PageID 1569).

Ames applied after encouragement from Trim. (Ames Dep. Doc. 62, PageID 1093.; Trim Dep., Doc. 64; PageID 1571). Ames and several other employees applied and interviewed for this unclassified position. (Ames Dep., Doc. 62; PageID 1096).[8] Because it was an unclassified position, no interviews were required, and the interview process that did occur was unstructured. (Walburn Tr. P. 29 Doc. 60; PageId 629; Trim Dep. Doc. 64; PageId 1571). Walburn and Trim met with three (3) candidates that expressed interest. (Walburn Dep., Doc. 60; PageID 627,628). Ames met with Walburn and Trim in April, 2019. (Ames Dep., Doc. 62; PageID 106; Walburn Dep., Doc. 60; PageID 634). Ames was not offered the position, and it went unfilled. The Department did not have a deadline to fill the position, and determined the priority was to take the necessary time to select the most appropriate candidate. (*Id.*). At some point, Yolonda Frierson, who did not initially express interest in the Bureau Chief position, asked Trim about the status of

---

position within the class. (*Id.*). There may be one or more positions within a class specification at an agency that have some common duties but are, in fact, different jobs because they involve different areas or programs within the agency. (*Id.*).

[8] As part of the process to fill the Bureau Chief position, Trim did not independently verify minimum qualifications, but assumed since all individuals expressing interest in the position were Program Administrators within the Department, that they were qualified. (Trim Dep. Doc. 64 PageID1571 ).

the position. (Frierson Dep. Doc. 63; PageID 1364). In December, 2019 Trim approached Frierson and asked her if she would be interested in serving in the role on a temporary capacity, known as a Temporary Work Level ("TWL"). (Frierson Dep., Doc. 63; PageID 1389). Trim felt that Frierson would do well in this role because Frierson had served in previous leadership roles, and Frierson had excellent leadership qualities. (*Id.*) Frierson assumed the TWL position, effective December 8, 2019. (Frierson Dep., Doc. 63; PageID 1389; Ex. 44, Doc 63-1; PageID 1468). Although Trim was involved in the interview process, Trim was not a decision maker in the selection of the successful candidate. (Trim Dep., Doc. 64; PageID 1581, 1582; Walburn Dep., Doc. 60; PageID 634-635). Walburn and Gies were the decision makers, and it was Walburn who recommended Frierson to Gies for appointment to the position. (Walburn Dep., Doc. 60; PageID 634-635). Frierson, was ultimately appointed to the position in a permanent capacity effective January 20, 2020. (Ex. 47, Frierson Dep. Doc. 63-1; PageID1476; Frierson Dec. ¶ 12) Frierson is female and identifies as gay (Frierson Dep., Doc. 63; PageID 1325).

Walburn was not aware of Frierson's sexual orientation. (Walburn Dep., Doc. 60; PageID 668). Walburn testified that Frierson was selected because she was the best candidate for the position who had "the skills and expertise necessary to the lead the administration of the Bureau of Compliance in a way that set DYS up for success." (Walburn Dep., Doc. 60; PageID 635). Because Walburn had previously held a Bureau Chief position, she had particular knowledge about what the position required, and how she wanted the position to contribute to the Department. (Walburn Dep.,Doc. 60; PageID 639). Walburn cited her own experience working with Frierson, specifically Frierson's work product, Frierson's past work experience, and Walburn's knowledge of Frierson's performance in the Department's correctional facilities as reasons why she was selected. (Walburn Dep., Doc. 60; PageID 637). Walburn also cited, as a positive factor in

Frierson's selection, that she had contributed ideas as to how to formulate the Bureau Chief position. (*Id*.)  All of these factors made Frierson a good fit for the position. (Walburn Dep., Doc. 60; PageID 630).

Ames did not perform well in the interview for the Bureau Chief position. (Walburn Dep., Doc. 60; PageID 640). Ames was not selected for the position because Walburn felt that she did not have the skills and leadership to take on such a broad role. (Walburn Dep., Doc. 60; PageID 640-641). Walburn stated that Ames leaned into her experience at the Department and her role as the PREA Administrator as rationale as to why she deserved the promotion. (Walburn Dep., Doc. 60; PageID 640). This was a newly created position and Walburn's impression of Ames was that she did not express a vision that showed understanding of the purpose of the Bureau Chief position, how to get the job done, and did not share any ideas on how she would expand and develop the role to meet the needs of the agency. (*Id*).

Trim also commented that Ames was unable to express the vision for the Bureau and was not a good fit for the position. (Trim Dep., Doc. 64; PageID 1579). Trim also agreed that she felt Frierson was more qualified for the position than Ames because of her experience. (Trim Dep., Doc. 64; PageID 1582). The other two applicants were not offered the position for similar reasons. (*Id*.). Ames admits that she was never told a reason for her not receiving the Bureau Chief position. (Ames Dep., Doc. 62; PageID 1116.).

## F.   The objective qualifications of the selected candidate for Bureau Chief of the Office of Quality

Prior to being appointed to the Bureau Chief position, Yolanda Frierson held several positions at the Department, which provided her significant management and leadership experience, which experience was pertinent to the Bureau Chief position duties. In these positions,

Frierson gained knowledge of management and the Department's policies and procedures, supervision of employees, and workforce planning.

Frierson was hired by the Department in 2006 as a Juvenile Corrections Officer at Scioto Juvenile Corrections Facility ("SJCF"). (Frierson Dep., Doc. 63; PageID 1330;East Dec. ¶10, Ex. C.; Frierson Dec.¶ 1-2). As a Corrections Officer, she provided safety, security and overall custodial care of committed youth. (Frierson Dep. Doc. 63-1; PageID 1483-1484; Frierson Dec.¶ 5) In 2011, Frierson became a Unit Manager at SJCF. where she supervised staff and provided leadership. (Frierson Dec.¶ 6, Ex. C) She also trained and developed staff throughout the Department on strength based behavioral management. (*Id*.) In 2013, Frierson moved into the position of Human Services Program Administrator 2 at SJCF (Frierson Dep.. Ex. 50; Dep. Doc. 63-1; PageID 1483-1484; Dep., Doc. 63; PageID 1329;  Frierson Dec.¶ 6). In this position, she was responsible for the Progress Program at SJCF. (*Id*.) She also directed the closed security units, monitored data to track trends of youth behavior and program compliance, collaborated with staff, behavioral health supervisors, and the Department's Central Office. (Frierson Dec.¶ 7; Frierson Dep. Ex. 50 Doc. 63-1; PageID 1483-1484; Frierson Dec.¶ 7). In August, 2013, Frierson became Deputy Superintendent of Direct Services at Circleville Juvenile Correctional Facility ("CJCF") (Frierson Dep., Doc. 63; PageID 1330-1331, Ex. 50 Dep. Doc. 63-1; PageID 1483-1484; East Dec. ¶10, Ex. C. Frierson Dec.¶ 8). As a Deputy Superintendent, Frierson supervised all direct staff, planned, administered all direct service programs, initiated investigations, monitored employee procedures and institutional data, modeled strength-based leadership, and collaborated with community members to facilitate rehabilitation. (*Id*). In 2014, Frierson moved to the Department's Central Office as the Facility Resource Administrator. (Frierson Dep., Doc. 63; PageID 1333; Frierson Dec.¶3, 9) In this position, Frierson worked with all of the facilities. (Frierson Dep., Doc.

63; PageID 1334). She performed monthly reviews of incidents such as use of force, acts of violence, seclusion, and contraband. (Frierson Dep. Ex. 50 Dep. Doc. 63-1; PageID 1483-1484). Frierson also worked with all the facilities' staff to evaluate and decrease use of force to improve facility safety, and collaborated on policy updates and revisions. (*Id.*) In March 2015, Frierson returned to CJCF as Deputy Superintendent of Program Services. (East Dec. ¶10, Ex. C.; Frierson Dec.¶ 10) And in February, 2018, Frierson returned to the Department's Central Office as a Human Services Program Administrator 3 in the Office of Quality. (Ex. 41, Frierson Dep. Doc. 63-1 PageID 1461 Frierson Dec.¶ 11) At the time Frierson was appointed to the Bureau Chief of Quality, she was working toward a bachelor of science in social sciences from Franklin University, which she earned in September, 2020. (Frierson Dep.,Doc. 63; PageID 1392; Frierson Dec.¶ 13). Frierson was appointed on January 19, 2020 to the Bureau Chief position in which her designated classification specification was an Administrative Officer 3. (Frierson Dec. ¶ 3, 12). Prior to her appointment, Frierson had in excess of 36 months of management and supervisory experience, which exceeded the minimum qualifications of an Administrative Officer 3. (*see* East Dec.¶ 26, Ex. R).

III.    **Law & Analysis**

   A.    **The Department is Entitled to Summary Judgment on Ames's Claims of Discrimination based on Gender or Sexual Orientation Under Title VII**

The Department is entitled to summary judgment on Ames's claims of discrimination, whether based on gender or sexual orientation. In order for a discrimination case to proceed under Title VII, under a theory of either disparate treatment based on sex or sexual orientation, to survive a motion for summary judgment, the plaintiff must adduce either direct or circumstantial evidence of unlawful discrimination. *Simpson v. Vanderbilt Univ.*, 359 Fed. Appx. 562, 568 (6th Cir. 2009). The *McDonnell Douglas* burden-shifting framework applies where a plaintiff offers no direct

evidence of discrimination. *McDonnell Douglas Corp. v. Green,* 411 U.S. 792, 802 (1973). Under this framework, the plaintiff must first make out her *prima facie* case of discrimination, after which the burden shifts to the employer to proffer a legitimate, nondiscriminatory reason for its decision. *Dews v. A.B. Dick Co*., 231 F.3d 1016, 1020–21 (6th Cir.2000). If the employer meets its burden, the plaintiff must then prove by a preponderance of the evidence that the employer's proffered reason is pretextual. *Id*.

> ### B.     Ames does not have Direct Evidence of Discrimination

Ames's Amended Complaint does not assert any allegations of direct discrimination with regard to gender or sexual orientation; and, Ames cannot provide any direct evidence of any unlawful discrimination. Direct evidence often comes in the form of comments by a person with decision-making authority regarding a plaintiff's employment. See, e.g. *Carter v. Univ. of Toledo*, 349 F.3d 269, 273 (6th Cir. 2003). Direct evidence generally requires unmistakable verbal assertions that the plaintiff was treated adversely because of some unlawful factor, such as her sex or sexual orientation in this case. *See Gaffney v. Potter*, 2007 U.S. Dist. LEXIS 85259 (N.D. Ohio Nov. 19, 2007). *See also Wexler v. White's Fine Furniture*, Inc., 317 F.3d 564, 570 (6th Cir. 2003) Further, direct evidence must be such that it establishes not only that the Department was predisposed to act on a discriminatory basis, but also that the Department acted on that predisposition in this case. *Hein v. All American Plywood Co*., 232 F.3d 482, 488 (6th Cir. 2000). When asked who had, allegedly, belittled, degraded, or offended her because of her sexual orientation, Ames could not recall any specifics. Ames stated, "Ma'am, the fact that I was demoted as straight female and that others have been knowing that they are in the LBGTI community, DYS employees know this, they have been promoted and I was demoted, that's humiliating because they whisper and say that the gays can get whatever they want while the rest of the straight people

don't....And before you ask me for specific names, I can't tell you specific names..." (Ames Dep., Doc. 62; PageID 1189).

Notably, Ames could not recall any statements made to her by any Department employees tying the recommendation to revoke her unclassified status to her sex or sexual orientation. When asked about what was said about why she did not get the promotion, or why she believed she was removed from her position, Ames stated, "No one's ever given me an explanation why I didn't receive a promotion." (Ames Dep., Doc. 62: PageID 1116). "I've never been told any reason why I was demoted either." (*Id*.). "No one has ever given me any reason, including whether or not they liked blonde hair or not, as a reason why I didn't get a promotion or was removed." (Ames Dep., Doc. 62: PageID 1119). When asked about why she believes Ms. Frierson (a gay, female) was promoted to Bureau Chief, Ames states,  "[Frierson] is in the LBGTI community and them stick together...." (Ames Dep., Doc. 62; PageID 1126-1127). Even taking all of her factual assertions in her Amended Complaint as true, that a co-worker (Stojsavljevic) said he wanted her job, or that Trim encouraged her to retire (Doc. 28, Page ID 199), these assertions are not indicative of gender-based or sexual-orientation based bias. Essentially, the gravamen of her lawsuit is based upon Ames's belief that because several Department employees identify as gay, the Department's decisions were motivated by anti-heterosexual animus. When asked about a gay, male employee who she claims received a cake and a party, Ames states, "[t]he only difference is that he's gay and I'm not." (Ames Dep., Doc. 62; PageID 1150). She further states, "I believe I was demoted because they wanted to promote Alex, who was gay, and promote Frierson, who is in the LBGTI community." (Ames Dep., Doc. 62; PageID 1150).

Ames has only her subjective belief of discrimination. Ames has not identified any statement by the decision makers responsible for the revocation of her unclassified status or her

promotion denial as evidence that her sexual orientation or gender played a role in those decisions. She has no direct evidence of any unlawful discrimination.

### C. The Department did not discriminate in selecting a gay employee for the Bureau Chief position.

In relation to Ames's claim of discrimination based upon her heterosexual orientation, if such a claim can even be made, then her claim must be analyzed under a reverse-discrimination paradigm as used in Title VII sex/race discrimination. When a plaintiff is asserting a claim for reverse-discrimination, the Sixth Circuit requires a higher burden of proof for plaintiffs, who are members of majority classifications. *Goller v. Ohio Dep't of Rehab. & Correction*, 285 F. App'x 250, 256 (6th Cir.2008).  "In cases involving reverse discrimination claims, such as here, the first prong in establishing a prima facie case does not require the plaintiff to show that he or she is a member of a racial minority; instead, it requires the plaintiff to establish "background circumstances [to] support the suspicion that the defendant is that unusual employer who discriminates against the majority." *Gregory v. Louisville/Jefferson Cty. Metro Govt.*, W.D.Ky. Civil Action No. 3:21-cv-577-CHB, 2021 U.S. Dist. LEXIS 247340, at *11-12 (Dec. 29, 2021) citing *Zambetti v. Cuyahoga Cmty. Coll.*, 314 F.3d 249, 255 (6th Cir. 2002) (citations omitted). *Russell v. City of Bellevue*, No. 3:20 CV 2859, 2021 WL 1517921, at *6 (N.D. Ohio Apr. 16, 2021). Background circumstances can consist of the following: statistical evidence or employment policies showing a history of unlawful consideration of race by the employer; evidence that the person responsible for the employment decision was a minority; or evidence of ongoing racial tension in the workplace. *Gregory,* Civil Action No. 3:21-cv-577-CHB, 2021 U.S. Dist. LEXIS 247340, at *11-12.

1.   **Ames cannot establish her prima facie case of sexual orientation discrimination in selecting a gay employee for the Bureau Chief**

      a.   **Ames cannot establish the 1st prong of her prima facie case because she has no background circumstances showing that the Department is the unusual employer who discriminates against the majority.**

Ames's Amended Complaint alleges that she was discriminated against when: (1) a gay, employee, Stojsavljevic, allegedly stated that he wanted Ames's job; (2) her gay supervisor, Trim, allegedly encouraged Ames to retire from her job; (3) Ames was not promoted over a gay, female employee; (4) Ames was replaced with a gay, male employee; and, (5) the Department threw a party, provided a cake and announcement for a gay, male employee, Jeffrey Spears, for his 30-years of service, while Ames only received a 30-year certificate and pin.[9] (Doc. 28, PageID 199). However, Ames cannot establish a reasonable causal connection between these complaints and discrimination based upon her sexual orientation. Ames has not indicated any specific examples or events where she or others were singled out for being heterosexual.  None of Ames's allegations implicate Ames's sexual orientation. Here, Ames simply states that she is heterosexual, and her coworkers are not. In order to circumvent this fatal issue in her allegations, Ames attempts to disguise the decisions to revoke her unclassified status and her non-promotion as being orchestrated by Trim and other "LGBTIQ" employees. (*Id.* ¶57). However, neither Trim - nor any other "LGBTIQ" employee - was a decision maker in the decisions to revoke Ames's unclassified status and the Bureau Chief promotion. The decisions came from two people, Director Gies and Assistant Director Walburn who are both heterosexual. [10] Further, Ames's *unsubstantiated*

---

[9] Although Ames asserts in her Amended Complaint that "gay supervisors" organized the events, she does know who organized the alleged events. Ames admitted that she does know the identity of the alleged "other gay supervisors." (Ames Dep., Doc. 62; PageID 1180).

[10] Abstractly, Ames's Amended Complaint acknowledges that the Department has heterosexual employees in positions of authority: Walburn, Gies, Gee, and Wendy Faulkner.

allegation that Stojsavljevic was once promoted allegedly in violation of the Department's hiring practices and that Spears received a cake, announcement and party is insufficient to demonstrate the requisite statistical evidence or employment policies showing a history of unlawful consideration of sexual orientation by the employer. (Doc. 28, PageID 199 ¶30).

### b. Ames cannot establish the fourth prong of her *prima facie* case of sexual orientation discrimination relative to the Bureau Chief promotion

To establish a *prima facie* case of gender or sexual orientation discrimination in the failure-to-promote context, Ames must present evidence that she (1) is a member of a protected class; (2) applied for, and did not receive, a position; (3) was qualified for the position; and (4) was rejected in favor of a similarly-situated applicant outside her protected class, or was otherwise treated differently than such applicant. *Jenkins v. Foot Locker Inc.*, 598 F.App'x 346, 349 (6th Cir. 2015).

Further, assuming arguendo that heterosexual orientation is a protected class, as discussed previously, Ames cannot meet the first prong of her prima facie case for reverse discrimination. Assuming arguendo that she can meet the first prong, the fact that Ames applied for a position that was later filled by a gay, female candidate and was evaluated by the same decision-makers does not, in and of itself, make her similarly situated to Frierson in relation to the fourth prong. *See White v. Columbus Metro. Housing Auth.*, 429 F.3d 232, 241-42 (6th Cir. 2005). To satisfy the fourth prong, the plaintiff must show that the position went to a person, outside the protected class, with similar qualifications. *Id.* at 242. Some comparison between Ames and Frierson is therefore necessary in considering the fourth prong of the *prima facie* case. *Id.* at 243.

A true comparison of Ames's qualifications to those of Frierson reveals that Ames is not as qualified as Frierson for the position of leading a Bureau of the Department. In contrast to Frierson, Ames had not held a management role with the Department, had no prior experience leading and supervising Department employees, and therefore, Ames fails to meet the fourth prong

of her *prima facie* burden. Yolonda Frierson was hired by the Department in 2006. (Frierson Dep., Doc. 63; PageID 1330;East Dec. ¶10, Ex. C.). She has held multiple positions in her time with the Department, including Deputy Superintendent of Direct Services at Circleville Juvenile Correctional Facility, Deputy Superintendent of Program Services at Circleville Juvenile Correction Facility, Facility Resource Administrator/Human Services Program Administrator 3 in the Office of Quality, Unit Manager at Scioto Juvenile Correctional Facility, and Juvenile Correctional Officer at Scioto Juvenile Correctional Facility (Frierson Dec. *Id.* East Dec. ¶10, Ex. C.).

With respect to managerial and supervisory positions, Frierson's experience far exceeds Ames's. Frierson worked as a Deputy Superintendent of the Department's Circleville Juvenile Correctional Facility on multiple occasions. As Deputy Superintendent, she had a significant leadership role. Notably, she managed, directed, and supervised Department employees; directed operations, unit management, programs and policies; evaluated employee performance, and recommended discipline. (Frierson Dec. ¶ 7) Additionally, Frierson was also Unit Manager at Scioto Valley Juvenile Correctional Institution. In this role, her responsibilities included supervising, training, and holding staff accountable for rule violations. (Frierson Dec. ¶6)  Though Ames had an undergraduate degree in technical education and some graduate course work; however, Frierson had nearly completed her undergraduate degree in social sciences, graduating in September, 2020. Both Ames and Frierson had similar years of service with the Department (Ames -15 years and Frierson - 13 years), however, Frierson had significant experience and a track record in management positions, supervising employees, directing operations and leadership positions with the Department that Ames lacked. Ames did not have any experience in these areas that would exceed Frierson's qualifications.

Comparing the qualifications of Ames and Frierson, it is clear that Frierson had superior experience in material and relevant respects, and therefore, Ames cannot be considered similarly qualified for the position, as required to meet the fourth prong of Ames's *prima facie* burden.

### 2. The Department's decision to promote Frierson was based on legitimate, nondiscriminatory business reasons.

The Department had legitimate, nondiscriminatory business reasons for its decisions. A defendant's production of a legitimate, nondiscriminatory reason for the challenged adverse employment action not only rebuts any presumption raised by plaintiff's asserted *prima facie* case, but also invites summary judgment review of plaintiff's burden to show pretext. *White v. Ohio*, 2 F.App'x 453, 458 (6th Cir. 2001).

The Department chose Yolonda Frierson for the Bureau Chief of Quality Assurance because she was the best candidate for the position who could "lead the Bureau of Compliance in a way that set DYS up for success." (Walburn Dep., Doc. 60; PageID 635). Walburn also felt that Frierson's previous work experience in the Department correctional facilities, Walburn's personal knowledge of her work product, and her shared insight into how to formulate the newly created Bureau Chief position made her the better candidate. (Walburn Dep.,Doc. 60; PageID 624). The breadth and depth of her experience made her a logical choice to assume the Bureau Chief role. Sexual orientation and gender simply were not a factor in the decision-making process. Finally, Assistant Director Walburn did not believe Ames would be a good candidate for the position because she was dissatisfied with Ames's leadership skills - based upon Walburn's assessment of Ames in her current role as PREA Administrator for the Department. (Walburn Dep. Doc. 60; PageID 640-641). Walburn explained that Ames "leaned" into her years of PREA Administrator experience during the interview, which from Walburn's perspective was insufficient. (Walburn Dep. Doc. 60, PageID 640). The Bureau Chief was a

much broader role than the PREA Administrator, and that Ames could not demonstrate to Walburn that she understood what the position required, and how she would develop the role to meet the Department's needs. (Walburn Dep., Doc. 60; PageID 640-641).

> **a.    Ames cannot establish that the Department's legitimate, nondiscriminatory business reasons for its decision to promote Frierson are pretext for discrimination.**

Ames can survive summary judgment only by showing a genuine issue of material fact as to whether the Department's proffered, legitimate, nondiscriminatory business reasons for its actions are pretext for discrimination. This, she cannot do. When assessing a claim that an employer's stated reason for an adverse action is pretextual, the question is whether the reason is made-up to conceal intentional discrimination. *Tingle v. Arbors at Hilliard*, 692 F.3d 523, 530 (6th Cir. 2012). Ames must produce sufficient evidence from which the fact finder could reasonably infer that the asserted discrimination was the real reason for the decisions. *Id.*

To show pretext, Ames must show: "(1) that the proffered reasons had no basis in fact; (2) that the proffered reasons did not actually motivate the decision; or (3) that they were insufficient to motivate the employment decision." *Jones v. St. Jude Medical S.C., Inc.*, 504 Fed. Appx. 473, 477 (6th Cir. 2012) (emphasis omitted). The Sixth Circuit has held that when an employer offers more than one independent, legitimate, nondiscriminatory reason for an adverse employment action, even if one is found to be pretextual but at least one other is not, the employer is entitled to summary judgment. *Id.* at 477-478; *Burks v. Yellow Transp., Inc.*, 258 Fed. Appx. 867, 876 (6th Cir. 2008).

> **i.    No basis in fact**

To challenge the factual basis of the Department's decisions, Ames claims that she is more qualified than the selected candidate, and the Department chose Frierson solely because she is gay.

*See, e.g., Harris v. City of Akron,* 6th Cir. No. 19-4101, 2020 U.S. App. LEXIS 39222, at *9 (Dec.

15, 2020). To show a triable question of fact as to pretext, based on the relative qualifications of

the candidates, Ames must establish that "either (1) the plaintiff was a plainly superior candidate,

such that no reasonable employer would have chosen the latter applicant over the former, or (2)

[the] plaintiff was qualified…if not better qualified than the successful applicant, *and the record*

*contains 'other probative evidence of discrimination*.'" *Id.* (emphasis added)*; see also Provenzano*

*v. LCI Holdings, Inc*., 663 F.3d 806, 815 (6th Cir. 2011). Ames can do neither. Importantly, Ames

has no other probative evidence of discrimination. As recently explained by the Sixth Circuit:

> A plaintiff faces a heavy burden to establish pretext based on
> qualifications evidence. When there is little other evidence of
> discrimination, a plaintiff must show that her qualifications were 'so
> significantly better than the successful applicant's qualifications that no
> reasonable employer would have chosen the latter applicant over the
> former.' A plaintiff's subjective belief that she is more qualified does not,
> of course, suffice to show pretext.

*Leisring v. Clerk of Hamilton Cnty. Mun. Court*, 6th Cir. No. 20-3395, 2020 U.S. App. LEXIS

40728, at *4-5 (Dec. 30, 2020) (internal citations omitted). Simply put, Ames has no evidence

that the decisions she challenges were a pretext for discrimination.

Ames puts forth only her subjective view that she is more qualified than Frierson. This,

however, does not raise a dispute of material fact. Ames's "subjective view of her qualifications

in relation to those of other applicants, without more, cannot sustain a claim of discrimination."

*Hedrick v. W. Reserve Care Sys.,* 355 F.3d 444, 462 (6th Cir. 2004); *see also Perryman v.*

*Postmaster Gen.*, 475 Fed.App'x. 585, 590 (6th Cir. 2012) (stating that the plaintiff's subjective

belief that she was better qualified than another candidate is insufficient to demonstrate pretext).

Moreover, Ames cannot show that those involved in making personnel decisions (Gies and

Walburn) did not "honestly believe" Frierson was the best candidate to serve as Bureau Chief.

"[W]hen qualifications evidence is all (or nearly all) that a plaintiff proffers to show pretext, the evidence must be of sufficient significance to call into question the honesty of the employer's explanation." *Bender v. Hecht's Dept's Stores,* 455 F.3d 612, 627 (6th Circuit 2004). One way for a plaintiff to demonstrate pretext is to show that the employer's "asserted business judgment was so ridden with error that defendant could not honestly have relied upon it." *Wexler, Wexler v. White's Fine Furniture,* 317 F.3d 564, 576 (6th Cir. 2003). If, however, reasonable decision-makers could disagree as to which candidate was better qualified, the Department is entitled to judgment as a matter of law on Ames's discrimination claims. *See Bender,* 455 F.3d at 628.

### ii. Did not actually motivate

Additionally, Ames cannot show that the Department's decisions were not actually motivated by legitimate, nondiscriminatory business reasons. To do so, Ames must show that the sheer weight of circumstantial evidence of discrimination makes it more likely than not that the Department's explanation is a pretext, or cover-up. *Manzer v. Diamond Shamrock Chems. Co.*, 29 F.3d 1078, 1084 (6th Cir. 1994). If Ames asserts that the Department did not post the unclassified position, or did not conduct a structured or formal interview, and that is evidence of pretext, that assertion is simply wrong. The Department's Application Selection Procedure does not require unclassified positions to be posted, interviews to be held, or any particular sequence in which a civil service application is completed or qualifications approved by the Department's Human Resources. (Gee Declaration, ¶¶ 7 -13; Walburn Dep., Doc. 60; PageID 631). However, even assuming that Ames is able to point to a past practice of holding interviews for unclassified positions (which she cannot), "an employer's failure to follow self-imposed regulations or procedures is generally insufficient to support a finding of pretext." *White,* 429 F.3d 232 at 246 (citations omitted).

### iii. Insufficient to motivate

Finally, Ames cannot show that the Department's proffered reasons are insufficient to motivate the Department's decision. As federal courts have frequently recognized, employers are entitled to some deference in business-making decisions and "it is inappropriate for the judiciary to substitute its judgment for that of management." *Smith v. Legget Wire Co.,* 220 F.3d 752, 763 (6th Cir. 2000). In hiring cases, the Sixth Circuit has repeatedly stated that, although a comparison of candidates is appropriate when the parties dispute whether an employee was chosen for a position based on qualifications versus discriminatory animus, federal courts do not act as a "'super personnel department,' overseeing and second-guessing employers' business decisions[.]" *Johnson v. Metro. Gov. of Nashville and Davidson Cnty.*, 502 F.App'x 523, 539 (6th Cir. 2012); *Bender,* 455 F.3d at 627. "[E]vidence that a rejected candidate was as qualified or marginally more qualified than a successful candidate is insufficient, in and of itself, to raise a genuine issue of fact" for trial. *Id*. An employer has even greater flexibility, and is entitled to additional deference, where, as here, a management-level position is at issue. *See Wrenn v. Gould,* 808 F.2d 493, 502 (6th Cir. 1987).

In sum, Ames's general assertions of discrimination are insufficient to overcome the Department's legitimate, nondiscriminatory reasons for its actions. *See Mitchell v. Toledo Hosp.*, 964 F.2d 577, 584-585 (6th Cir. 1992) (plaintiff's subjective belief and/or conclusory statements are not sufficient evidence to maintain a claim of discrimination). Because Ames cannot offer any evidence of pretext, the Department is entitled to judgment as a matter of law.

**D.    The Department did not discriminate against Ames in revoking her unclassified position and replacing her with a gay, male employee.**

**1.    Ames cannot establish the first prong of her prima facie sexual orientation case because she has no background circumstances showing DYS is the unique employer that discriminates against the majority.**

If heterosexual sexual orientation is a protected class, Ames cannot, as previously discussed herein, establish the first prong of her *prima facie case* of reverse discrimination. The decision to revoke her position was made by two heterosexual employees, the Director and Assistant Director. And further, Ames has not and cannot produce statistical evidence or employment policies showing a history of unlawful consideration of sexual orientation by the employer in relation to the revocation of unclassified positions.

**2.    The Department does not dispute Ames can establish the prima facie case of her gender discrimination claim for revocation of her unclassified position**

The Department does not dispute that Ames is a member of a protected class (female), was qualified for her job, suffered an adverse employment action, and was replaced by a person outside the protected class (male), and therefore, meets her *prima-facie* case of gender discrimination. See *White v. Baxter Healthcare Corp.*, 533 F.3d 381, 391 (6th Cir. 2008) (citing McDonnell Douglas Corp. v. Green, 411 U.S. 792, 802, 93 S. Ct. 1817, 36 L. Ed. 2d 668 (1973)).

**3.    The Department's decision to revoke Ames's unclassified status was based on legitimate, nondiscriminatory business reasons.**

However, the Department can articulate legitimate, nondiscriminatory business reasons for revoking Ames's unclassified status. As the new appointee to lead the Department, Gies moved to put people in place and implement his vision for the Department. (Gies Dec., Doc. 69; PageID 2129-2130). Gies noted that sexual victimization was a significant concern for both the Department and the Governor's office. Gies collaborated closely with Walburn, and relied upon

29

her expertise in formulating decisions as to how to best move the Department forward. One of the initiatives that Gies and Walburn identified was to operate the PREA program with a proactive policy framework. (Walburn Dep., Doc. 60; PageID 620-621). The Department desired to elevate performance, and move away from merely meeting compliance with the paperwork in order to "live by PREA standards on a daily basis". (*Id*.). Walburn's existing concerns with Ames's ability to lead and administer the PREA program, increased after she interviewed Ames for the Bureau Chief position. (Walburn Dep., Doc. 60; PageID 624). Ames performed poorly in the interview, and from Walburn's perspective, showed a lack of leadership skills to continue to lead the PREA program, proactively. Walburn consulted with Gies, and the decision was made to revoke Ames's unclassified status. At the time of their decision to revoke Ames's position, there was no discussion of who would be her replacement. It was only after the decision was made that Gies and Walburn discussed potential candidates. The *only* consideration that motivated Gies's and Walburn's decision was to move PREA in a different direction to fulfill the Department's mission of protecting youths in its care.

> **a.** **Ames cannot establish that the Department's legitimate, nondiscriminatory business reasons for its decision to revoke Ames's unclassified status are pretext for discrimination**

To demonstrate pretext, a plaintiff is required to show: (1) that the proffered reasons had no basis in fact; (2) that the proffered reasons did not actually motivate the decision; or (3) that they were insufficient to motivate the employment decision. *See, e.g., Russell v. Univ. of Toledo*, 537 F.3d 596, 604 (6th Cir. 2008); *see also Manzer,* 29 F.3d at 1083. "In order to prove pretext, therefore, the plaintiff must introduce admissible evidence to show that the proffered reason was

not the true reason for the employment decision and that discriminatory animus was the true motivation driving the employer's determination."

### i.    No basis in fact

Ames's denial of the Department's articulated reasons for her revocation of unclassified status, without further substantiation, is insufficient for a discrimination claim to withstand summary judgment. *Mitchell v. Toledo Hosp*., 964 F.2d at 577.

Director Gies and Assistant Director Walburn were responsible for effectuating the Department's mission.  After the appointment of Geis, the Department underwent a reorganization of positions. As the senior leadership team, Gies and Walburn met to determine policy initiatives and personnel matters, including the PREA program. (Walburn Dec. ¶¶8, 9) Both Gies and Walburn honestly believed that Ames lacked the ability to lead the PREA program, and that her removal was in the best interest of the Department and the PREA program. (Geis Dep., Doc. 69; PageID 2123, 2125; Walburn Dep. Doc. 60; PageID 648-649; Walburn Dec. ¶¶ 9 - 14).

"[A]s long as the employer held an honest belief in its proffered reason, the employee cannot establish pretext even if the employer's reason is ultimately found to be mistaken, foolish, trivial, or baseless." *Seeger v. Cincinnati Bell Tel. Co., LLC*, 681 F.3d 274, 285-86 (6th Cir. 2012) (citation omitted). *Sims-Madison v. Dana Commer Vehicle Mfg., LLC*, 6th Cir. No. 21-5706, 2022 U.S. App. LEXIS 8389, at *6-7 (Mar. 28, 2022) "[W]e do not require that the decisional process used by the employer be optimal or that it left no stone unturned." *Smith v. Chrysler Corp.*, 155 F.3d 799, 807 (6th Cir.1998). Instead, a plaintiff must "put forth evidence which demonstrates that the employer did not 'honestly believe' in the proffered nondiscriminatory reason for its adverse employment action." *Braithwaite v. Timken Co*., 258 F.3d 488, 494 (6th Cir. 2001) (*citing Smith*, 155).

31

## ii.    Did not actually motivate

Additionally, Ames cannot show that the Department's decisions were not actually motivated by legitimate, nondiscriminatory business reasons. To do so, Ames must show that the sheer weight of circumstantial evidence of discrimination makes it more likely than not that the Department's explanation is a pretext, or cover-up. *Manzer,* 29 F.3d at 1084.

Ames seeks to dispute the Department's articulated reasons for revoking her unclassified position based upon her performance evaluations and that Gies wrote positive comments on her 2011, 2012 and 2013 evaluations. However, since the time of Gies's comments, his opinion of her had changed. (Geis Dep., Doc. 69; PageID 2099). He received feedback from community partners that "[Ames] was difficult to work with, hard to communicate with, and dictated rather than helping our partners in the community." (Gies Dep., Doc. 69; PageID 2099-2101). Gies further described feedback regarding Ames's workplace demeanor as "abrasive." (Gies Dep., Doc. 69; PageID 2108). Five (5) Directors of community correctional facilities reported their difficulties working with Ames. (Geis Dep., Doc. 69; PageID 2101-2103). Additionally, Gies had also received negative feedback concerning Ames from Assistant Director Walburn. With respect to her performance evaluations, Ames's most recent evaluation support the contention that certain areas of Ames's PREA administration were of concern to the Department. In her 2018 performance review, Trim directed Ames to "take a more active role in the area of managing PREA grant funds in the next rating period" and to take the opportunity to improve to ensure she was providing accurate advice and guidance to senior leadership. (Trim Dep., Doc 64, PageID 1528; Ex. 53 Doc. 64-1; PageID 1647). Therefore, the fact that Ames was rated overall meets expectations before her unclassified status was revoked does not support a conclusion that Walburn and Gies were satisfied with her leadership in the administration of the PREA program. Whether or not her performance

warranted her removal does not establish that the Department's articulated reasons were pretext for prohibited discrimination. See *McDonald v. Union Corp*., 898 F.2d at 1160, 1162 ("[*McDonald*] does not raise a material issue of fact on the question of the quality of his work merely by challenging the judgment of his supervisors"). See also *Mesnick v. Gen. Elec. Co*., 950 F.2d 816, 825 (1st Cir. 1991) ("Courts may not sit as super personnel departments, assessing the merits-or even the rationality-of employers' nondiscriminatory business decisions."). *Palucki v. Sears, Roebuck & Co*., 879 F.2d 1568, 1571 (7th Cir. 1989) ("An employer can set whatev/er performance standards he wants, provided they are not a mask for discrimination on forbidden grounds such as race or age").

### iii.  Insufficient to motivate

Even if Ames succeeded in attacking the credibility of the Department's proffered reason for her revocation of unclassified status, Ames has failed to allege any circumstances tending to prove that intentional discrimination was a deciding factor in the employment decision. *St. Mary's Honor Ctr v. Hicks*, 113 S. Ct. 2742, 2751-52. Ames has offered no specific evidence tending to show any discriminatory animus whatsoever on the part of the Department. Ames's conclusory assertions and her assumption that discrimination was the motivating factor in the revocation of her position are simply not sufficient to withstand a motion for summary judgment. *McDonald*, 898 F.2d at 1162; *Young v. State Farm Mut. Auto. Ins. Co*., 868 F. Supp. 937, 945 (W.D. Tenn. 1994). See also *Moody v. Jefferson Parish Sch. Bd*., 803 F. Supp. 1158.

The evidence which Ames offers, which purports to prove that intentional discrimination was the motivating factor is the fact that she was replaced by a gay, male. That fact alone, however, is insufficient to prove discriminatory animus. Ames's showing that she was replaced by someone outside of the protected class is a required element of plaintiff's *prima facie* case. See *Manzer*, 29

F.3d at 1081. In rebutting the defendant's proffered non-discriminatory reason, however, "the plaintiff may not rely simply upon his *prima facie* evidence but must, instead, introduce additional evidence of discrimination." *Manzer*, 29 F.3d at 1084; see also *St. Mary's Honor Ctr.*, 113 S. Ct. at 2749, quoted supra note 4. Plaintiff here has failed to do so.

Further, in her Amended Complaint, presumably as evidence of discrimination, in a conclusory fashion, Ames broadly asserts that "others" outside her protected "groups" were either not demoted or did not receive such a significant decrease in their compensation when moved to another position, or demoted due to discipline." (Doc. 28, PageID 201 ¶60). *See, Manzer*, 29 F.3d at 1084."It is the plaintiff's burden to establish that a similarly situated person outside the protected class was treated more favorably than [plaintiff]." *Noble v. Brinker Int'l, Inc.*, 391 F.3d 715, 728-29 (6th Cir. 2004) (citing *Mitchell v. Toledo Hosp.*, 964 F.2d 577, 583 (6th Cir. 1992)).

If Ames argues that the Department treated her differently than others outside her protected class when it revoked her position and should have placed her in another vacancy when she was removed, she is simply wrong. Director Gies, as the appointing authority, had the right to revoke Ames's unclassified appointment with or without cause. *See, e.g.*, *McClain*, 440 F.3d 320, 330. Ames was afforded her statutory fallback rights.

Ames alleges the following individuals were treated more favorably than her: Ginine Trim, Yolonda Frierson, Nathan Lawson, Chris Freeman, Jeff Spears,[11] Kenya Brown, and Michael Garrett.[12] (Ex. 14, Ames Dep., Doc. 62; PageID 1183; Ex. 14. Doc. 62-1, PageID 1296).

---

[11] Spears was previously discussed in relation to Ames's claim that he allegedly received a cake, party and announcement by "gay supervisors."

[12] Ames's alleges that Frierson was treated more favorably because she received the Bureau Chief of Quality position. Ames Dep. Doc. 62; PageID 1183; Ex. 14. Doc. 62-1, PageID 1296). These allegations were previously discussed in the Department's analysis of the Bureau Chief promotion and selection of Frierson. Ames's basis for Trim as a comparator are insufficient.

Ames alleges that Kenya Brown ("Brown") was "removed from her position as a Deputy Superintendent at Cuyahoga Hills JCF [*sic*] and ODYS created a position for her." (*Id*.). Here, Ames identifies Brown as a female and does not know the sexual orientation of Kenya Brown. (Ames Dep., Doc. 62; PageID 1213). Ames cannot establish any similarities with Brown, in relation to job position, duties, or supervisors, or the circumstances under which Brown was allegedly removed.

Ames alleges Michael Garret ("Garret") was "brought into DYS from Montgomery County in a created position (2019 or 2020), and later given a promotion in 2021." Ames offers no evidence of Garret's sexual orientation. (Ex. 14, Interrogatory No. 9  p. 10-11, Ames Dep., Doc.62; PageID 1183, Ex. 14, Doc. 62-1, PageID 1296). Further, Ames was a current employee of the Department, and her unclassified position was revoked with fallback rights. There is no similarity between being hired, and a revocation of unclassified status.

Nathan Lawson ("Lawson"), a Youth Services Regional Administrator at the Toledo Regional Office, like Ames, had his unclassified status revoked by a previous appointing authority, Harry Reed. Like Ames, Lawson was provided fall back rights, pursuant to ORC 124.11, to his last classified position of Juvenile Parole Service Supervisor. Lawson elected his statutory rights. (Trim Dep. Doc. 64; PageID 1603; Ex. 58 Doc. 64-1; PageID 1695) In accordance with ORC 124.11, because there was no vacancy in the department, he accepted the classified position that the Ohio Department of Administrative Services ("DAS") determined was comparable in compensation to the position previously held in the classified service. The comparable position as determined by DAS was the Human Services Program Administrator 2 at the Toledo Regional

---

Ames states Trim was treated more favorably because Trim was her "gay supervisor [who], encouraged [her] to retire and replace[d] [her] with a gay male."

Office, Lucas County. (*Id.*). Therefore, Lawson received the exact same treatment afforded to Ames. Since the Executive Secretary I position no longer existed, the Ohio Department of Administrative Services determined a comparable available position in the classified service for Ames to accept or reject, which was the Administrative Professional 4 position. Furthermore, Ames and Lawson are not similarly situated, comparable employees. *See*, *Mitchell.*, 964 F.2d at 583. Lawson and Ames worked in different divisions of the Department, had different supervisors, different job titles and job duties. (*Id.*).

Ames alleges that Chris Freeman ("Freeman"), a male, received discipline of a written reprimand, but was not removed from his position. Ames and Freeman are not similarly situated, comparable employees. Freeman and Ames worked in different divisions of the Department, had different supervisors, different job titles and job duties. Chris Freeman was a Bureau Chief of Parole (Human Services Program Administrator). Freeman did not have his unclassified status revoked. (East Dec. ¶ 21, Ex. M; East Dec., ¶ 19 Ex. K). Freeman is not similarly situated to Ames, and therefore, Freeman is not a comparator as evidence of discrimination.

Ames, therefore, has failed to advance evidence sufficient to support either the conclusion that Department's proffered reasons for revoking her unclassified status are not credible or that the revocation was based upon prohibited considerations such as her gender or her sexual orientation. Ames has no evidence that the Department's actions were pretextual, and in fact, based upon her gender or sexual orientation.

## IV.    Conclusion

For the foregoing reasons, Defendant respectfully requests that the Court grant its motion for summary judgment. There are no genuine issues of material fact, and the Department is entitled to judgment as a matter of law. This lawsuit should be dismissed.

Respectfully submitted,

DAVE YOST (0056290)
Ohio Attorney General

*/s/ Cathleen B. Slater*

CATHLEEN B. SLATER (0066088)
*Trial Counsel*
Principal Assistant Attorney General
MEGAN E. JEWETT (0079534)
Senior Assistant Attorney General
Employment Law Section
30 East Broad Street, 16th Floor
Columbus, Ohio 43215
(614) 644-7257 - Telephone
(614) 752-4677 – Facsimile
elsreview@OhioAGO.gov

*Counsel for Defendant*

## <u>CERTIFICATE OF SERVICE</u>

This will certify that the foregoing, *Defendant Ohio Department of Youth Services'*
*Motion for Summary Judgment*, was filed electronically on June 10, 2022. Notice of this filing
will be sent to all parties by operation of the Court's electronic filing system. Parties may access
this filing through the Court's system.

*/s/ Cathleen B. Slater*

CATHLEEN B. SLATER (0066088)
*Trial Counsel*
Principal Assistant Attorney General