**IN THE UNITED STATES DISTRICT COURT**
**FOR THE SOUTHERN DISTRICT OF OHIO**
**EASTERN DIVISION**

| | | |
|---|---|---|
| MARLEAN A. AMES, | : | |
| | : | |
| **Plaintiff,** | : | |
| | : | **Case No. 2:20-cv-05935** |
| v. | : | |
| | : | **Chief Judge Algenon L. Marbley** |
| STATE OF OHIO DEPARTMENT OF | : | **Magistrate Judge Elizabeth P. Deavers** |
| YOUTH SERVICES, | : | |
| | : | |
| **Defendant.** | : | |

## OPINION & ORDER

This matter comes before the Court on the Motion for Summary Judgment of Defendant State of Ohio Department of Youth Services ("DYS" or "the Department"). (*See* ECF No. 71). This case arises from allegations of sex-based discrimination experienced by Plaintiff Marlean Ames in the course of her employment with DYS. For the reasons set forth more fully below, the Court **GRANTS** Defendant's motion.

### I.    BACKGROUND

### A.    Factual Background

There are two incidents at the core of Ames's allegations. The Court begins by laying out the background context of employment within a state agency, describes Ames's employment history with DYS, and then delves into the two incidents in detail.[1]

---

[1] The facts set forth below are largely drawn from Defendant's Motion for Summary Judgment (ECF No. 71), as Ames has stated that "[t]he Statement of Facts included in the Defendant's Motion for Summary Judgment is largely correct" and appears to adopt portions of Defendant's Statement of Facts verbatim in her reply brief. There are two exceptions. First, Ames suggests that Defendant has omitted one factual allegation regarding comments made by Alex Stojsaljevic. (Memo. in Opp'n at 1, ECF No. 72). The omitted allegation is included and discussed *infra*.

Ames also requests that the unsworn statements presented by Defendant's witnesses, which Defendant relies on in its Statement of Facts, be struck. (*Id.* at 1). Fed. R. Civ. P. 56(c) requires that "[a] party asserting that a fact cannot be . . . genuinely disputed must support the assertion by [] citing to particular parts of materials in the record,

1

1.    *The Ohio Civil Service and the Department of Youth Services*

DYS is a state agency that oversees juvenile corrections, parole, and the rehabilitation of youth through community programs. *See generally* Ohio Rev. Code ch. 5139. The Department's offices consist of the agency headquarters located at the central office in Columbus, three (3) juvenile correctional facilities, and five (5) district sites for parole services. (*See* Declaration of Kelly East ("East Decl.") ¶ 4, ECF No. 71-4). The correctional facilities are: Circleville Juvenile Correctional Facility ("CJCF"); Cuyahoga Hills Juvenile Correctional Facility ("CHJCF"); and Indian River Juvenile Correctional Facility ("IRJCF"). *See Facilities*, OHIO DEP'T OF YOUTH SERVS., https://dys.ohio.gov/facilities/welcome.

The Department employs around 961 individuals, spread across nine divisions. (*See* Memo. in Supp. Mot. for Summ. J. ("Memo. in Supp.") at 2, ECF No. 71). DYS employees are either classified or unclassified civil servants, as the Department falls within Ohio's civil service. *See* Ohio Rev. Code § 124.11. Classified employees, if in a skilled position, must pass a civil service examination, *see id.* § 124.11(B)(1), and are typically employed in non-managerial positions. *Cf. id.* § 124.11(A) (noting that the unclassified service includes elected officials, members of boards and commissions, heads of departments, etc.). Classified civil servants enjoy "considerable job protection," including a statutory fallback right. *Campbell v. Wash. Cnty. Pub. Libr. Bd. of Trs.*, No. 04CA44, 2005 WL 1405789, at *2 (Ohio Ct. App. June 10, 2005).

---

including depositions, documents, electronically stored information, affidavits, or declarations, stipulations (including those made for purposes of the motion only), admissions, interrogatory answers, or other materials." Further, "[a]n affidavit or declaration used to support or oppose a motion must be made on personal knowledge, set out facts that would be admissible in evidence, and show that the affiant or declarant is competent to testify on the matters stated." Fed. R. Civ. P. 56(c)(4). Defendant's Statement of Facts is supported by a number of declarations and depositions. Each declaration is signed and sworn under penalty of perjury. (*See, e.g.*, Declaration of Robin Gee at 4, ECF No. 71-1). Similarly, each deponent was first duly sworn before testifying. (*See, e.g.*, Deposition of Ryan Gies 6:1–3, ECF No. 69). As such, Defendant has fully complied with the requirements of Rule 56; Ames's request to strike is without basis and is therefore denied.

2

Unclassified employees, on the other hand, "serve at the pleasure of their appointing authority, and may be dismissed from their employment with or without cause." *McClain v. Nw. Cmty. Corr. Ctr. Jud. Corr. Bd.*, 440 F.3d 320, 330 (6th Cir. 2006) (quoting *Campbell*, 2005 WL 1405789, at *2 (internal citations omitted)).  Unclassified positions include elected officials and department officials; many high-level managerial positions within state agencies are also unclassified.  *See, e.g.*, Ohio Rev. Code § 124.11(A)(9).  In the case of DYS, unclassified positions are appointed by the Director of the Department.  *See id.* § 5139.01(B).  The "fallback right" allows a classified employee who is appointed to an unclassified position to retain the right to 'fall back' to her most recently held classified position—that is, "to resume the position and status held . . . in the classified service immediately prior to [her] appointment to the position in the unclassified service"—if her unclassified position is revoked.  Ohio Rev. Code § 124.11(D)(2).

Because of the unique nature of unclassified positions, the application and interview process for these positions at DYS differs greatly from the equivalent process for classified positions.  For example, openings for unclassified positions are not required to be posted and do not require interviews.  (*See* Declaration of Robin Gee ("Gee Decl.") ¶¶ 7–11, ECF No. 71-1).  Additionally, whereas an applicant for a classified position within DYS must complete an application upon seeing an open position posting and an HR analyst must evaluate her qualifications before the applicant interviews for the position, the sequence of events for filling unclassified positions in DYS is less rigid; the application and even the qualifications verification may occur after an individual has already been interviewed or appointed.  (*Id.* ¶¶ 11, 13–14).

### 2.    Employment History with the Department

Ames first began working for DYS in 2004.  (Deposition of Marlean Ames ("Ames Dep.") 37:14–16, ECF No. 62).  She started as an Executive Secretary in the Akron Parole Region, before

3

moving to the IRJCF in the same role in 2005. (*Id.* 37:19–23). This position was in the classified civil service. (*See id.* 53:4–5, 19–22). In early 2009, Ames was appointed to a position with the specification of Administrative Assistant 3 and a working title of Community Facility Liaison,[2] which was part of the unclassified civil service. (*Id.* 54:6–14). The specification of the position later changed from Administrative Assistant 3 to Program Administrator 2, but with no alteration to Ames's responsibilities or pay grade. (*See id.* 72:3–20; Ames Dep. Ex. 7, ECF No. 62-1 at 10). As Community Facility Liaison, Ames did not supervise or direct other employees; her primary responsibilities included assisting her supervisor in evaluating, monitoring, and inspecting facilities and facility programs, and working with facilities to ensure compliance with the Ohio Administrative Code. (*See* Ex. 6, ECF No. 62-1 at 9). The role also required Ames to help facilities comply with the Prison Rape Elimination Act of 2003 ("PREA"), 34 U.S.C. § 30301–09. (*Id.*; *see also* Ames Dep. 74:18–21, ECF No. 62). The role was based out of the Department's central office in Columbus. (Ames Dep. 60:19–20, ECF No. 62).

In 2014, Ames was promoted to the position of PREA Administrator, located within the DYS Office of Quality and Improvement. (*Id.* 38:5–7). The position of PREA Administrator had a specification of Program Administrator 3 and was unclassified. (*See id.* 78:16–23). As PREA Administrator, Ames did not supervise any employees. (*See* Ex. D, ECF No. 71-4 at 16). She was initially supervised by Wendy Faulkner, who Ames identified as a "straight female," until 2017, when Ginine Trim, who Ames identified as a member of the "LBGTI" community, took over. She

---

[2] Employment positions are referred to by both "class specification" and by a "working title" or "position." The "specification" is, in effect, the grade level as set by the Ohio Department of Administrative Services for positions at all state agencies. (*See* Declaration of Kelly East ("East Decl.") ¶ 6, ECF No. 71-4). Each department or agency may have multiple "positions" for a given "class specification." A "position" or "working title" is specific to the actual role and is a more tailored label based on the requirements and responsibilities of the role. (*See id.* ¶ 7; Memo. in Supp. at 12 & n.6, ECF No. 71). A position is not classified (in terms of the classified/unclassified distinction) simply because it has a class specification.

had good, professional working relationships with both Faulkner and Trim.  (*See* Ames Dep. 94:12–15, 95:2–6, 96:7–20, ECF No. 62; Deposition of Julie Walburn ("Walburn Dep.") 17:14–16, ECF No. 60).  At the time, Trim was the Deputy Director of the Division of Professional Standards and Chief Inspector in the Office of Quality and Improvement.  (*See* Deposition of Ginine Trim ("Trim Dep.") 25:6–12, ECF No. 64).  Trim reported to Julie Walburn, the assistant director of DYS, who reported to Ryan Gies, the director of DYS appointed by Governor DeWine in 2019.  (*Id.* 27:22–25; *see* Deposition of Ryan Gies ("Gies Dep.") 13:7–9, ECF No. 69).  Ames had no personal knowledge about the sexual orientation of Walburn or Gies but assumed that Gies was straight.  (Ames Dep. 109:1–5, 110:5–9, ECF No. 62).

In 2019, while Ames was still serving as PREA Administrator, the Office of Quality and Improvement announced the creation of a new position: the Bureau Chief of Quality Assurance and Improvement.[3]  (*See id.* 115:23–2; Trim. Dep. 79:2–8, ECF No. 64).  Ames applied and interviewed for the position but did not receive the promotion.  (*See* Ames Dep. 116:19–117:3, ECF No. 62).  Shortly afterward, on May 10, 2019, Robin Gee, from the Department's HR team, and Walburn informed Ames that she was being removed from her unclassified position as PREA Administrator and offered her the option of invoking her statutory fallback right.  (*Id.* 97:4–17; Gee Decl. ¶¶ 22, 31, ECF No. 71-1).  Ames eventually accepted the decision and returned to her most recently classified position as an Administrative Professional 4 (the new classification for Executive Secretary 1, the position Ames had last held in 2009 before she was appointed to the unclassified position of Administrative Assistant 3) at the Indian River facility.  (Ames Dep. 99:22–100:15, ECF No. 62).  She is currently still employed by the Department, after being

---

[3] The "class specification" for this position is Administrative Officer 3.

promoted to Human Services Program Administrator 2, an unclassified position. (*See* Memo. in Supp. at 7, ECF No. 71).

The two adverse employment events of 2019—first, the decision not to appoint Ames to the position of Bureau Chief of Quality Assurance and, second, the decision to revoke her unclassified appointment as PREA Administrator—are described more fully in the following sections.

### 3. *Application for Appointment to Bureau Chief*

Walburn envisioned the new position of Bureau Chief of Quality Assurance as a management role responsible for providing leadership and oversight of staff members in the Office of Quality and Improvement. (*See* East Decl. Ex. B, ECF No. 71-4 at 10). Management, workforce planning, and supervision were among the knowledge areas that the Department was looking for in applicants to the position. (*Id.*). Once Department leadership decided to create the position, Trim announced the position to the employees within the Office of Quality and Improvement via both email and an informal internal meeting and invited any interested team members to apply. (Trim Dep. 79:13–20, 87:21, 88:7–20, EF No. 64).

Three team members, including Ames, applied for the position and interviewed with Trim and Walburn in April 2019. (Ames Dep. 117:11–16, 119:7–9, ECF No. 62). In preparation for the interview, Ames conducted research and generated ideas about how to address deficiencies with the Department's facilities in a more holistic, multidisciplinary fashion. (*See id.* 119:9–19; 123:3–12). Ames felt confident coming out of the interview, especially as Walburn had expressed interest in an article on juvenile justice that Ames mentioned and Walburn and Trim had given Ames positive feedback at the end of the interview. (*See id.* 125:8–126:13). Overall, Ames felt like Walburn and Trim gave her a fair shot. (*Id.* 126:14–16). Walburn and Trim, however, had a

6

different impression about Ames's suitability for the role.  In particular, Walburn expressed concern that Ames failed to lay out her "vision for what the job was meant to do or any vision for how to get the job done . . . [or] ideas on how to lay the foundation for this role."  (Walburn Dep. 40:9–14, ECF No. 60; *see also* Trim Dep. 90:8–11, ECF No. 64) (suggesting that Ames "wasn't able to really express the vision" for the position).  Walburn also worried that Ames lacked the requisite leadership skills for the position.  (*See* Walburn Dep. 40:24–41:1, ECF No. 60).

Ames was not hired for the position.  Walburn and Trim had not set a deadline for filling the Bureau Chief position and decided to prioritize finding the best fit over hiring someone promptly.  (*See* Walburn Dep. 34:17–21, ECF No. 60).  Six months later, Yolanda Frierson, who also worked in the Office of Quality and Improvement, reached out to Trim to ask about the status of the search process for a new Bureau Chief.  Neither she nor her colleagues in the Office had heard any updates from Walburn or Trim since April about any of the three applicants and was unsure if the position was still open or even still existed.  (*See* Deposition of Yolanda Frierson ("Frierson Dep.") 48:9–50:23, ECF No. 63).  On December 10, 2019, Trim offered the Bureau Chief position to Frierson on a temporary basis, which she accepted.  (*Id.* 75:25–76:5; *see id.* 74:6–75:8; 77:4–9).  Frierson was then given a permanent appointment as Bureau Chief on January 23, 2020.[4]  (Frierson Dep., Ex. 47, ECF No. 63-1 at 18).

Although Trim informed Frierson of the appointment, it was Walburn who had decided to select Frierson and recommended her appointment to Gies.  (*See* Trim Dep. 91:20–92:2, 92:21–93:1, ECF No. 64) (noting that Trim did not have decisionmaking power and that the final decision for the Bureau Chief appointment rested with Walburn and Gies).  Whereas Walburn had

---

[4] The effective date of the appointment was January 19, 2020.  (*id.*).

7

expressed fears that Ames lacked vision and leadership, Walburn had worked well with Frierson in the past and felt that Frierson had good ideas on how to formulate the Bureau Chief position. (*See* Walburn Dep. 35:2–7, 20–23, 37:12–16, ECF No. 60). Importantly, Frierson had previously worked in management roles within the Department, where she had gained experience supervising other employees and completing performance evaluation—tasks that Ames had never handled. (*See* Declaration of Yolanda Frierson ("Frierson Decl.") ¶¶ 6, 8, ECF No. 71-5) (describing her work supervising staff as Unit Manager at SJCF and as Deputy Superintendent of Direct Services at CJCF). Frierson had joined DYS in 2006, two years after Ames; prior to the promotion to Bureau Chief, she had served as a Juvenile Corrections Officer, a Unit Manager, and a Human Services Program Administrator 2 at SJCF, before moving to CJFC as a Deputy Superintendent and then to the Department's Columbus office as Facility Resource Administrator and later Human Services Program Administrator 3 (with a brief return to CJCF as Deputy Superintendent of Program Services in between). (*Id.* ¶¶ 2, 5–11). Frierson identifies as female and gay. (Frierson Dep. 10:14–19, ECF No. 63).

### 4. Removal as PREA Administrator

The lack of vision identified by Walburn during Ames's interview for Bureau Chief ultimately resulted in her removal from her position as PREA Administrator as well. The Governor's Office had indicated to Gies, upon his appointment as Director, that addressing issues of sexual victimization within the juvenile corrections system was a priority concern. (*See* Gies Dep. 62:19–63:4, ECF No. 69). Gies quickly set about reorganizing the Department, combining the previously separate Chief Inspector's Office and the Office of Quality and Improvement into a single division. (Declaration of Ginine Trim ("Trim Decl.") ¶¶ 7–9, ECF No. 71-3). This

reorganization required moving personnel around: Trim, for example, moved from the Office of Technology to the new division. (*Id.* ¶ 8).

In his previous role as deputy director for the parole courts and community division of DYS, Gies had supervised Ames and had signed off on strong reviews of her performance each year between 2011 to 2013. (*See* Gies Dep. 28:2–30:22, ECF No. 69). But, apparently, Gies's impression of Ames as an employee took a downward turn between then and when he was appointed Director, based on feedback he had received from community partners that Ames was difficult to work with, abrasive, and not collaborative (though the feedback did not contain any criticisms of her work ethic or dedication). (*See id.* 31:22–32:6). And whereas the Governor's Office wanted Gies to revamp the Department's PREA approach, Gies recalls Walburn expressing concerns that Ames "did not have a vision and could not carry the culture of our facilities and preventing victimization from occurring." (*Id.* 63:19–23). Walburn was worried, specifically, that Ames would be unable to steer DYS towards more proactively complying with PREA standards. (Walburn Dep. 20:18–21:10). One sticking point was Ames's administration of PREA grant funds; Trim, Ames's direct supervisor, remembered Gies and Walburn being unhappy with the slow rollout of grants. (*See* Trim Dep. 36:22–37:8, 40:8–12, ECF No. 64). In fact, Trim noted in a performance review that Ames needed to improve her management of PREA grant funds (though she nevertheless rated Ames's overall performance as meeting expectations). (*Id.* 40:19–21).

Based on the sum of these concerns, Gies and Walburn made the decision to remove Ames from her classified position as PREA Administrator. (*See* Walburn Dep. 54:22–55:1, ECF No. 60). They discussed potential replacements and eventually settled on Alex Stojsavljevic. (Gies Dep. 73:19–20, 75:23–46:5, ECF No. 76). Gies does not recall the precise timeline of these discussions (including whether any such discussions occurred before Ames was notified of the

decision), but is adamant that he and Walburn agreed not to contact any potential candidates prior to removing Ames.  (*Id.* 74:1975:4).  Gies liked Stojsavljevic as a potential candidate because he had worked firsthand with Stojsavljevic, Stojsavljevic had experience with PREA while at the Indian River facility, and Gies felt that Stojsavljevic had demonstrated strong planning and communication skills.  (*See id.* 79:5–14).

Ames claims that her demotion and replacement by Stojsavljevic was part of a long-running scheme to kick her out.  She claims that Trim had previously suggested to her a number of times that she should consider resigning or returning to the Indian River facility to be closer to home.  (*See* Ames Dep. 191:12–192:18, ECF No. 62).  Trim does not recall any such conversations with Ames.  (Trim Dep. 52:1–6, ECF No. 64).  Ames also claims that Stojsavljevic had apparently been angling for Ames's position for some time, stating in front of their coworkers that he wanted the PREA Administrator position.  (*See* Ames Dep. 179:2–5, ECF No. 62).  Stojsavljevic acknowledges telling Ames, as well as other co-workers, but characterized it as an inside joke between the two of them.  (*See* Deposition of Alex Stojsavljevic ("Stojsavljevic Dep.") 67:10–68:11, ECF No. 61).  At the time, he and Ames were living together with roommates.  (Ames Dep. 174:15–21, ECF No. 62).  Ames considered him not only a friend, but also a mentee, though she was worried at times about Stojsavljevic's impatient attitude towards climbing the ranks within the Department and his claims that he could manipulate people to get what he wanted on the basis of being a gay man.  (*See id.* 180:18–183:1).  And Ames was concerned that these claims might have been true, because she had heard that Stojsavljevic had been promoted to PREA Compliance Manager at IRJCF in October 2017 without even being eligible for the promotion.  The superintendent there, Chris Freeman, apparently devised a work-around to the rule that employees

on probationary status, like Stojsavljevic, could not be promoted; he asked Stojsavljevic to resign from his job and then hired him in the new role the next day.[5]  (*See id.* 188:10–190:1).

Ames also claims that Stojsavljevic's former supervisors, Stephanie Groff and Jodi Slagle, had reassured him that they would help him with his goal of becoming PREA Administrator.  (*See id.* 175:8–20; *see also* Stojsavljevic Dep. 52:10–24, ECF No. 61).  Further, Ames claims that Slagle, who was friendly and familiar with Gies, went to Gies about Stojsavljevic's desire for the job.  (Ames Dep. 175:21–176:1, ECF No. 62).  This claim is not corroborated by other deponents; Stojsavljevic, for example, remembers Slagle and Groff telling him, in response to his interest in the PREA Administrator position, that Ames "was not going to move out of that position" but that they would "help [him] get more PREA experienced or activities that [he] wanted to do surrounding PREA."  (Stojsavljevic Dep. 93:23–94:14, ECF No. 61).  Gies makes no mention in his deposition of any such conversation with Slagle, or, in fact, any awareness of Stojsavljevic's interest in the job.  (*See* Gies Dep. 85:7–14, ECF No. 69).

Gies and Walburn finalized the decision to appoint Stojsavljevic as the new PREA Administrator on May 26, 2019.  (*See id.* 91:22–92:2).  Gies had been told by others at the Department that Stojsavljevic was gay some years prior, but did not have any personal knowledge to that effect.  (*See id.* 90:17–91:17).  Trim also knew that Stojsavljevic was gay, though she did not have any role in the decision to appoint him; she was informed of the decision to promote Stojsavljevic by Walburn after the decision was made.  (Trim Dep. 70:11–71:3, ECF No. 64).

### B.  Procedural Background

---

[5] Ames does not have first-hand knowledge of this event.  (*Id.* 189:22–190:1).

Plaintiff filed a charge of discrimination against Defendant Ohio Department of Youth Services with the Ohio Civil Rights Commission and the U.S. Equal Employment Opportunity Commission ("EEOC") on August 21, 2019. (*See* Pl.'s Ex. 3, ECF No. 1-3). The EEOC reached a determination of reasonable cause and issued a 90-day right to sue letter on September 8, 2020. (*Id.*). Subsequently, on November 18, 2020, Ames filed her initial Complaint (ECF No. 1) in this Court, alleging eight causes of action under federal and state law. Ames later amended her complaint. (*See* Am. Compl., ECF No. 28). In the Amended Complaint, Ames again asserted eight claims: (1) gender and sexual orientation discrimination pursuant to Title VII of the Civil Rights Act of 1964, 42 U.S.C. §§ 2000e to 2000e-17; (2) hostile work environment based on sexual orientation and age under Title VII; (3) retaliation under Title VII; (4) age discrimination under the Age Discrimination in Employment Act of 1967, 29 U.S.C. §§ 621–34; (5) violations of due process rights under the Fourteenth Amendment; (6) age discrimination under Ohio Rev. Code ch. 4112;[6] (7) gender discrimination under Ohio Rev. Code ch. 4112; and (8) hostile work environment under Ohio Rev. Code ch. 4112.

On June 23, 2021, Defendant DYS filed its Motion for Judgment on the Pleadings (ECF No. 31). The Court dismissed Counts 2–7, finding that: (1) the Plaintiff had failed to state a claim with regards to her Title VII hostile work environment, Title VII retaliation, and Fourteenth Amendment due process claims (Counts 2, 3, and 5, respectively); (2) the Court lacked subject matter jurisdiction over Plaintiff's ADEA claim (Count 4); and (3) Plaintiff's state law claims (Counts 6, 7, and 8) were barred by the State's sovereign immunity under the Eleventh Amendment. (*See generally* Op. & Order, ECF No. 50). Count 4 was dismissed with prejudice,

---

[6] Plaintiff did not specify a statute within Chapter 4112 for Counts 6–8.

and Counts 2, 3, 5, 6, 7, and 8 dismissed without prejudice. The parties subsequently engaged in extensive discovery. On June 10, 2022, Defendant DYS filed its Motion for Summary Judgment (ECF No. 71) as to the remaining Title VII sex-based discrimination claim. That motion is now ripe for this Court's review.

## II. STANDARD OF REVIEW

Federal Rule of Civil Procedure 56(a) states that summary judgment is appropriate "if the movant shows that there is no genuine issue as to any material fact and the movant is entitled to judgment as a matter of law." The Court must view the evidence in the light most favorable to the non-moving party, and draw all reasonable inferences in the non-movant's favor. *S.E.C. v. Sierra Brokerage Servs., Inc.*, 712 F.3d 321, 327 (6th Cir. 2013) (citing *Tysinger v. Police Dep't of City of Zanesville*, 463 F.3d 569, 572 (6th Cir. 2006)). This Court then asks "whether 'the evidence presents a sufficient disagreement to require submission to a jury or whether it is so one-sided that one party must prevail as a matter of law.'" *Patton v. Bearden*, 8 F.3d 343, 346 (6th Cir. 1993) (quoting *Anderson v. Liberty Lobby*, 477 U.S. 242, 251–52 (1986)). Summary judgment is inappropriate, however, "if the evidence is such that a reasonable jury could return a verdict for the non-moving party." *Anderson*, 477 U.S. at 248. Evidence that is "merely colorable" or "not significantly probative" is not enough to defeat a motion for summary judgment, *id.* at 249–50, nor is "[t]he mere existence of a scintilla of evidence to support [the non-moving party's] position" sufficient. *Copeland v. Machulis*, 57 F.3d 476, 479 (6th Cir. 1995); *see also Anderson*, 477 U.S. at 251.

The initial burden rests upon the movant to present the Court with law and argument in support of its motion, and to identify the relevant portions of "'the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any,' which it believes

demonstrate the absence of a genuine issue of material fact." *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986) (quoting Fed. R. Civ. P. 56).  If this initial burden is satisfied, the burden then shifts to the nonmoving party to set forth specific facts showing that there remains a genuine issue for trial.  *See* Fed. R. Civ. P. 56(e); *see also Cox v. Ky. Dep't of Transp.*, 53 F.3d 146, 150 (6th Cir. 1995) (noting that after the burden shifts, the nonmovant must "produce evidence that results in a conflict of material fact to be resolved by a jury").

## III.    LAW & ANALYSIS

Allegations of discrimination in the employment context may be established by the introduction of either direct evidence of discrimination or by providing circumstantial evidence that supports an inference of discrimination.  *See Kline v. Tenn. Valley Auth.*, 128 F.3d 337, 348 (6th Cir. 1997) (citing *Talley v. Bravo Pitino Rest., Ltd.*, 61 F.3d 1241, 1248 (6th Cir. 1995)). Direct evidence of discrimination, such as "'eyewitness' testimony as to the employer's mental processes," *U.S. Postal Serv. Bd. of Governors v. Aiken*, 460 U.S. 711, 716 (1983), is rarely available, *see Kline*, 128 F.3d at 348, and Ames has acknowledged that her "evidence of discrimination is entirely circumstantial" in this case.  (*See* Pl.'s Resp. at 5, ECF No. 72).

In assessing allegations of discrimination based on circumstantial evidence, courts rely on the burden-shifting framework set forth in *McDonnell Douglas Corp. v. Green*, 411 U.S. 792, 802– 04 (1973).  Under that framework, the plaintiff alleging discrimination bears the initial burden of establishing a *prima facie* case of retaliation, by demonstrating that: "(1) he or she was a member of a protected class; (2) he or she suffered an adverse employment action; (3) he or she was qualified for the position; and (4) he or she was replaced by someone outside the protected class or was treated differently than similarly-situated, non-protected employees." *Briggs v. Univ. of Cincinnati*, 11 F.4th 498, 508 (6th Cir. 2021) (quoting *Wright v. Murray Guard, Inc.*, 455 F.3d

702, 707 (6th Cir. 2006) (internal citations omitted)).  Where the plaintiff is a member of a majority group, however, she bears an additional "burden of demonstrating that [s]he was intentionally discriminated against 'despite [her] majority status.'"  *Murray v. Thistledown Racing Club, Inc.*, 770 F.2d 63, 67 (6th Cir. 1985) (internal citations omitted).  As such, a plaintiff alleging reverse discrimination must show that "background circumstances support the suspicion that the defendant is that unusual employer who discriminates against the majority" to establish the first prong of the *prima facie* case.  *Id.* (quoting *Parker v. Balt. & Ohio R.R. Co.*, 652 F.2d 1012, 1017 (D.C. Cir. 1981)); *see also Romans v. Mich. Dep't of Hum. Servs.*, 668 F.3d 826, 837 (6th Cir. 2012) (internal citations omitted).

If a plaintiff is able to demonstrate a *prima facie* case of employment discrimination, the burden shifts to the defendant to provide a "legitimate, nondiscriminatory reason" for its actions.  *McDonnell Douglas*, 411 U.S. at 802.  This is satisfied if the employer "explains what [it] has done or produces evidence of legitimate nondiscriminatory reasons."  *Texas Dep't of Cmty. Affs. v. Burdine*, 450 U.S. 248, 256 (1981).  And, if the employer is able to satisfy its burden, "the burden of production shifts back to [Plaintiff] to demonstrate that [the employer's] proffered reason was a mere pretext for discrimination."  *Kenney v. Aspen Techs., Inc.*, 965 F.3d 443, 448 (6th Cir. 2020) (citing *Abbott v. Crown Motors Co.*, 348 F.3d 537, 542 (6th Cir. 2003)).  There are three ways in which a plaintiff can demonstrate pretext: "(1) that the proffered reasons had no basis in law, (2) that the proffered reasons did not actually motivate the employer's actions, or (3) that they were insufficient to motivate the employer's actions."  *Romans*, 668 F.3d at 839 (quoting *Chen v. Dow Chem. Co.*, 580 F.3d 394, 400 (6th Cir. 2009)).  The essential question for courts evaluating claims of pretext is "whether the employer made a reasonably informed and considered decision before taking an adverse employment decision."  *Burdine*, 450 U.S. at 256.

Having set forth the analytical framework for employment discrimination claims pursuant to Title VII, the Court now turns to the allegations made by Ames in this case. Ames alleges two instances of discrimination: first, the failure to promote her to the position of Bureau Chief; and second, the decision to revoke her appointment as PREA Administrator. (*See* Pl.'s Resp. at 4, ECF No. 72). Ames alleges that both instances constitute sex-based discrimination,[7] because she is a woman and is heterosexual. *Cf. Bostock v. Clayton Cnty.*, 140 S. Ct. 1731, 1743 (2020) (affirming that discrimination on account of sexual orientation or gender identity is "in part because of sex").

### A.     Failure to Promote

As set forth previously, Ames applied for a promotion to the position of Bureau Chief of Quality Assurance and Improvement in April 2019, but did not receive the promotion. That position was eventually given to Yolanda Frierson, a gay woman, on a full-time basis in January 2020. Ames alleges that the decision to choose Frierson over her demonstrates sex-based reverse discrimination in violation of Title VII—in other words, that she was denied for the position because she is heterosexual.[8]

Accordingly, this Court evaluates Ames's failure-to-promote claim under the modified *McDonnell Douglas* burden-shifting framework set forth above, under which Ames must point to "background circumstances" to establish the first prong of her *prima facie* case. Examples of "background circumstances" sufficient to demonstrate that an employer has discriminated against

---

[7] Ames refers to both bases of discrimination as "gender-based." (*See, e.g.*, Pl.'s Resp. at 4, ECF No. 72). Title VII bars discrimination on the basis of an individual's "race, color, religion, sex, or national origin." 42 U.S.C. § 2000e-2. Title VII does not, on the other hand, mention gender-based discrimination. Similarly, *Bostock*, which Ames cites for the proposition that a gender-based discrimination claim may be based on sexual orientation, actually discussed sex-based discrimination. *Bostock*, 140 S. Ct. at 1737 (noting, in explaining the holding, that "[s]ex plays a necessary and undisguisable role in the decision [to fire an individual for being homosexual or transgender], exactly what Title VII forbids"). Accordingly, the Court refers to Ames's claims as rooted in allegations of sex-based discrimination, not gender-based discrimination, throughout this Opinion & Order.

[8] In contrast to Ames's claim regarding the revocation of her appointment as PREA administrator, this incident does not state a claim for discrimination against Ames as a woman because Frierson is also a woman.

a majority group include statistical analysis of the employer's unlawful consideration of protected characteristics in past employment decisions, *see Sutherland v. Mich. Dep't of Treasury*, 344 F.3d 603, 614 (6th Cir. 2003), the fact that a minority employer replaced the plaintiff with another employee of the same minority group, *see Zambetti v. Cuyahoga Cmty. Coll.*, 314 F.3d 249, 257 (6th Cir. 2002), and evidence of "organizational preference" for hiring members of a minority group. *Nelson v. Ball Corp.*, 656 F. App'x 131, 136–37 (6th Cir. 2016) (quoting *Sampson v. Sec'y of Transp.*, 182 F.3d 918, 1999 WL 455399, at *1 (6th Cir. June 23, 1999) (unpublished)); *see also Romans*, 668 F.3d at 837 (noting that evidence of past hiring policies favoring minority applicants may demonstrate the necessary "background circumstances" of reverse discrimination (internal citations omitted)).

Ames is unable to meet this threshold requirement.  She has not "present[ed] significant evidence in the form of statistical data tending to show in the years prior to the employment decisions at issue, the [] Department considered [sexual orientation] in making employment decisions." *Sutherland*, 344 F.3d at 615.  She has not "submitted a large number of [Department] policies and procedures which reflect an organizational preference for establishing a diverse group of employees," or in fact any such Department policies or procedures to that affect.  *Sampson*, 1999 WL 455399, at *1.  And, perhaps most importantly, she has not demonstrated that her adverse employment action was authorized by or involved any individuals who were also members of the same minority group as Frierson (that is, the LGBTI community);[9] in fact, the undisputed evidence in this case is that Walburn and Gies, both of whom Ames believes are heterosexual, made the decision not to promote her and to select Frierson instead. *See Nelson*, 656 F. App'x at 137 ("Most

_____

[9] The Court adopts Ames's use of the label "LGBTI," which stands for "lesbian, gay, bisexual, transgender, and intersex" and is the term used by the Officer of the United Nations High Commissioner of Human Rights (as compared to the terms "LGBTQ" or "LGBTQ+," which are more commonly used in the United States).

fatal to Nelson's prima facie case [of reverse race discrimination] is the undisputed fact that all of the employees involved in the investigation and subsequent termination of Nelson were Caucasian."). Moreover, neither Gies nor Walburn had personal knowledge about Frierson's or Ames's sexual orientation.

The only support Ames can provide for a finding of "background circumstances" is that she has allegedly suffered two adverse employment decisions on account of her sex—which, Ames argues, "constitutes a pattern." (Pl.'s Resp. at 5, ECF No. 72). But two data points are not enough to establish a pattern. *Cf.* IAN FLEMING, GOLDFINGER (1959) ("Mr. Bond, they have a saying in Chicago: 'Once is happenstance. Twice is coincidence. The third time, it's enemy action.'"). Compare, for example, the statistical evidence presented in *Sutherland*: there, plaintiffs provided a statistical analysis of the percentage of auditor positions at the employer held by different demographics across a twenty-year span. *Sutherland*, 344 F.3d at 615–16. In *Zambetti*, plaintiff's allegations included evidence of the employer's hiring practices over a six (6) year span. *Zambetti*, 314 F.3d at 256; *see also id.* at 257 (noting the difficulty of drawing inferences from hiring data without knowing the "composition of the applicant pools for those positions"). These cases demonstrate that extensive, rigorous evidence is required to establish a pattern for the purposes of "background circumstances," given the unusual form of discrimination at issue. Moreover, the two incidents that comprise the "pattern" alleged by Ames are her own (as yet unproven) allegations in the case *sub judice*. *See id.* at 256 (describing evidence produced by plaintiff of past employment decisions relating to third parties); *cf. Brooks v. Am. Broad. Cos., Inc.*, 999 F.2d 167, 172 (6th Cir. 1993) ("[T]he district court was not required to accept unsupported, self-serving testimony as evidence sufficient to create a jury question." (*citing Comfort Trane Air Conditioning Co. v. Trane Co.*, 592 F.2d 1373, 1383 (5th Cir. 1979)). Therefore, the Court concludes that

18

Ames's own allegations of two discriminatory adverse events are, on their own, clearly insufficient to establish the "background circumstances" necessary for a plaintiff to make a *prima facie* case of reverse discrimination.

Where a plaintiff is unable to satisfy the first prong of the *prima facie* case of employment discrimination, the Court is not required to reach the second and third steps of the *McDonnell Douglas* burden-shifting framework.  *Zambetti*, 314 F.3d at 257 (citing *Murray*, 770 F.2d at 68; *Jamison v. Storer*, 830 F.2d 194, 1987 WL 44901, at *3 (6th Cir. Sept. 30, 1987) (unpublished)). As Ames has failed to demonstrate "background circumstances support[ing] the suspicion that [DYS] is that unusual employer who discriminates against the majority," *Murray*, 770 F.2d at 68 (quoting *Parker*, 652 F.2d at 1017), the Court finds that she has failed to satisfy her burden of establishing a *prima facie* case of sex-based employment discrimination for her failure-to-promote claim.  Accordingly, the Court **GRANTS** Defendant's Motion for Summary Judgment (ECF No. 71) as to the failure to promote claim.

### B.      Revocation from PREA Administrator Position

The decision to demote Ames from the PREA Administrator position presents a more complicated analysis, as she was replaced with Stojsavljevic, a gay man; this claim, in other words, presents allegations of discrimination on the basis that Ames is heterosexual and also on the basis that Ames is a woman. [10]  The Court addresses each alleged basis for discrimination in turn, starting with the allegation of discrimination based on sexual orientation.

As noted previously with respect to Ames's failure to protect claim, a plaintiff alleging reverse discrimination in the employment context must establish the existence of "background

---

[10] DYS phrases this as a "revocation" of Ames's unclassified status; as the decision effectively demoted Ames, the Court variously refers to the May 2019 decision as a revocation or a demotion.

circumstances" in order to carry her burden of making out a *prima facie* case of discrimination. Ames alleges the same form of reverse discrimination here as she did regarding the decision not to promote her to Bureau Chief: that is, Ames claims that she was replaced as PREA Administrator on account of being heterosexual. But the same deficiencies that plagued Ames's failure to promote claim crop up here too. She has neglected to provide any statistical evidence of past reverse discrimination, any indication of policies or procedures indicating organizational preferences for minority applicants, or any suggestion that the decisionmakers behind her demotion (and the subsequent promotion of Stojsavljevic) were members of the LGBTI community. *See supra* Part III.A. Without such evidence, the Court concluded that Ames could not establish a *prima facie* case of discrimination based on sexual orientation for her failure to protect claim; similarly, the Court concludes that she is also unable to establish a *prima facie* case of reverse discrimination based on sexual orientation for her demotion claim.

The Court next considers Ames's claim that she was demoted and replaced by Stojsavljevic because she is a woman. The Department acknowledges that Ames can carry her burden of establishing a *prima facie* claim with respect to this issue. (*See* Memo. in Supp. at 29, ECF No. 71). It is undisputed, after all, that Ames is a member of a protected class (as a female), was qualified for her role as PREA Administrator, was terminated (i.e., an adverse employment action), and was replaced by a male employee. *See Briggs*, 11 F.4th at 508. The Department suggests, however, that the decision to revoke Ames's position as PREA Administrator was based on legitimate, nondiscriminatory business reasons. (Memo. in Supp. at 29–30, ECF No. 71). These reasons include Gies' desire to revamp the Department's PREA strategy into a more proactive approach, based in part on the Governor's concern with sexual victimization in juvenile correctional facilities, and Walburn's concerns that Ames did not have the vision, ability, or

leadership skills to carry out Gies' vision.  (*See id.*).  The reasons also included the negative feedback that Gies had received about Ames being abrasive and a difficult person with whom to work.  *See Thompson v. Bd. of Educ.*, No. 3:12-cv-00327, 2013 WL 6001626, at *7 (S.D. Ohio Nov. 12, 2013) (finding that the employer's determination that plaintiff employee would not be a good fit because he was "arrogant, a know-it-all, and an overly-assertive person" was a "honest, legitimate, and non-discriminatory" rationale).  Gies explicitly noted in his testimony that the question of who would replace Ames in the PREA Administrator role was not a consideration in the decision to remove Ames and, in fact, was not discussed until after the removal decision had already been made.

As to the final step in the burden-shifting framework, the Department argues that Ames is unable to demonstrate that the proffered rationale has no basis in fact, did not actually motivate Gies and Walburn's decision, or was insufficient to motivate Gies and Walburn — in short, that Ames is unable to show pretext.  (*See* Memo. in Supp. at 31–36, ECF No. 71).  First, DYS suggests that Gies and Walburn both believed that Ames lacked the ability to revamp the PREA program and administer funds in a more proactive manner.  *See Smith v. Chrysler Corp.*, 155 F.3d 799, 807 (6th Cir. 1998) (noting that "the employer must be able to establish its reasonable reliance on the particularized facts before it at the time the decision was made").  The testimony provided by DYS leadership supports the inference that they made a "reasonably informed and considered decision" to demote Ames: Gies and Walburn both testified about the Department's vision for the role and the specific issues they had with Ames's prior work performance (including her communication style and slow deployment of PREA grant funds)*.*  Second, DYS argues that these concerns truly did motivate the decision to remove Ames.  The positive performance reviews Gies had written about Ames in 2011–13 do not demonstrate that the proffered explanation is a post-hoc

rationalization, according to DYS, because Gies later received negative feedback about Ames that undermined his earlier impression of her work. (*See* Memo. in Supp. at 32, ECF No. 72). And it certainly is true that impressions and attitudes regarding an employee's work product and skills can shift over the course of six (6) years.

Nor is the fact that Stojsavljevic told other employees and his former supervisors that he wanted the PREA Administrator job enough to create a genuine issue about whether the valid business concerns set out by Gies and Walburn actually motivated their decision to remove Ames. There is little indication that they were aware of the comments or of Stojsavljevic's interest. Ames suggests that Sagle, who was friendly with Gies, went to Gies to inform him of Stojsavljevic's desire for the PREA Administrator job, but Stojsavljevic claims that Sagle was not receptive towards his expression of interest, told him to look elsewhere for a new job, and encouraged him to get more PREA experience; Gies makes no mention of a discussion with Sagle (or with Groff) about Stojsavljevic as a candidate for the PREA Administrator position, and neither Gies nor Walburn mentioned any awareness of Stojsavljevic's comments leading up to their decision to promote him to PREA Administrator. In other words, there is no genuine dispute that the record lacks evidence that Stojsavljevic's comments had any influence on Gies and Walburn—or that his interest in the job was the real motivator behind their decision to revoke Ames's unclassified appointment.

DYS asserts that the proffered reasoning was sufficient to motivate the demotion decision, by pointing out that Ames has failed to adduce evidence demonstrating that intentional discrimination was the actual motivating factor. (*See id.* at 33–36). Finally, DYS argues that Ames has failed to put forward "evidence that employees outside the protected class engaged in 'substantially identical conduct' and fared better than [she] did." *Roseman v. Int'l Union, United*

22

*Auto., Aerospace and Agric. Implement Workers of Am.*, No. 20-2151, 2021 WL 4931959, at *4 (6th Cir. July 14, 2021) (quoting *Manzer v. Diamond Shamrock Chems. Co.*, 29 F.3d 1078, 1084 (6th Cir. 1994)). Ames testified as to seven individuals that she believes were treated more favorably than her.[11] (*See* Memo. in Supp. at 34, ECF No. 71). But Ames has not provided evidence of how they have engaged in substantially identical conduct or have fared better than she did; in fact, as DYS points out, Ames is unable to establish similarities with the individuals or explain how they have been treated more favorably.[12]

The same is true of Ames's attempts to demonstrate pretext. She baldly asserts that the nondiscriminatory rationale proffered by DYS is overly vague, is "precisely the sort of factually baseless justification that employers have been using for years to justify their own bigotry and discrimination," and "is unworthy of credence," but does not provide any evidence that that is the case. (Pl.'s Resp. at 9, ECF No. 72) (quoting *Reeves v. Sanderson Plumbing Prod., Inc.*, 530 U.S. 133, 143 (2000) (internal citations omitted)). Under the *McDonnell Douglas* burden-shifting framework, once an employer has provided a nondiscriminatory reason, the burden of production shifts back to the plaintiff, to show that the proffered reason is pretextual — that it is without basis in fact, did not actually motivate the decision, or was insufficient to motivate the decision. *See Burdine*, 450 U.S. at 256–57 (noting that a Title VII defendant need not "persuad[e] the court that

---

[11] She mentions only three individuals, Frierson, Stojsavljevic, and Trim, in her opposition to DYS's motion for summary judgment. (Pl.'s Resp. at 9, ECF No. 72).

[12] The seven individuals were: Ginine Trim, Yolonda Frierson, Nathan Lawson, Chris Freeman, Jeff Spears, Kenya Brown, and Michael Garret. In the first instance, Ames did not work in the same divisions or under the same supervisors at DYS as Kenya Brown, Nathan Lawson, or Chris Freeman. (Memo. in Supp. at 35–36, ECF No. 71). She cannot show that Michael Garret received more favorable treatment than her. (*See id.* at 35). Trim was her supervisor and was not similarly situated. Her allegations about Frierson have been discussed already. And finally, she alleges that Spears received a cake and party by the gay supervisors on his 30th work anniversary, whereas Ames did not receive cake or party for the same occasion, but is unable to name any of the supervisors who allegedly threw the party. (*See* Ames Dep. 202:11–14, ECF No. 62). DYS suggests instead that the party may actually have been to celebrate Spears' return to work after some time away. (*See id.* at 203:15–24).

it had convincing objective reasons for preferring the chosen applicant above the plaintiff" but must only "produce evidence of legitimate nondiscriminatory reasons" (quoting *Bd. of Trs. of Keene State Coll. v. Sweeney*, 439 U.S. 24, 29 (1978) (Stevens, J., dissenting))).

Ames has not done so here: she points to no facts in the record tending to suggest that the explanation is without a factual basis, did not motivate the decision, or was insufficient to do so; instead, she suggests only that "the other evidence of discrimination—see the promotions of Frierson, Stojsavljevic, and Trim" — demonstrate that the proffered rationale is not credible.  (Pl.'s Resp. at 9, ECF No. 72).  But the promotions of Frierson and Stojsavljevic are the *alleged* instances of discrimination made in this case; they do not constitute stand-alone evidence of discrimination. *See also Manzer*, 29 F.3d at 1084 (holding that a "plaintiff may not rely simply upon his prima facie evidence but must, instead, introduce additional evidence of age discrimination" to rebut a proffered nondiscriminatory reason for the adverse employment action).  As to the promotion of Trim, Ames has provided no proof that that employment decision was rooted in bias or discrimination, nor is it alleged in Ames's Complaint, Amended Complaint, or deposition testimony that Trim was promoted because she is gay.  (*See generally* Compl., ECF No. 1; Am. Compl., ECF No. 28).  To the contrary, Ames's assertion in her memo contra that Trim's promotion is "evidence of discrimination" is entirely unsupported by any citations to the record, detailed factual allegations, or further explanation.  Conclusory statements without a factual basis are insufficient to create a genuine issue and withstand a motion for summary judgment.

In short, Ames has failed to provide "background circumstances" sufficient to establish a *prima facie* case of sexual orientation-based discrimination; she has also failed to provide evidence creating a genuine dispute of material fact as to whether Defendant DYS's proffered legitimate, nondiscriminatory reasons for revoking her appointment as PREA Administrator was pretext.

24

Accordingly, the Court **GRANTS** Defendant's Motion for Summary Judgment (ECF No. 71) on Ames's discrimination claim about her demotion.

## IV.    CONCLUSION

For the reasons stated more fully above, this Court **GRANTS** Defendant's Motion for Summary Judgment (ECF No. 71).  Plaintiff's Title VII sex-based discrimination claims are **DISMISSED WITH PREJUDICE**.

**IT IS SO ORDERED.**

**ALGENON L. MARBLEY**
**CHIEF UNITED STATES DISTRICT JUDGE**

**DATE:  March 16, 2023**

25